**In re Jimmy Delwyn CLEMENTS and Nell Brock Clements, Debtors.**

**Bankruptcy No. 94–3779–BKC–3F3.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 22, 1995.

Earl M. Barker, Jr., Jacksonville, FL, for debtors.

David B. Ferebee, Jacksonville, FL, Evans Crowe, Mobile, AL, for Locomotion Prop., Ltd.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case is before the Court upon an Objection to Claim # 6 of Locomotion Properties, Ltd., filed by the Debtors (Doc. No. 19). A hearing was held on the Objection on April 20, 1995 at which the Court heard testimony of witnesses, received evidence and heard argument of counsel. Based upon the evidence presented at the hearing, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Debtors filed their petition in bankruptcy under Chapter 13 on September 2, 1994. On December 8, 1994, Locomotion Properties, Ltd. (hereinafter "Locomotion") filed a Motion for Relief from Stay, which this Court subsequently denied on February 7, 1995 after issuing Findings of Fact and Conclusions of Law (Doc. Nos. 30 and 31). On January 3, 1995, Locomotion filed a claim in the amount of $250,138.98, which Debtors objected to on January 17, 1995.

The genesis of this litigation concerns a lease of real property in Alabama. On November 2, 1979, Locomotion executed a lease of property with a building located in Mobile, Alabama to Twickenham Station, Inc., (hereinafter "TSI") who was to use the property to operate a restaurant. At the time of the formation of the lease, Debtor Jimmy Clements, was one of the principals of TSI, along with two other men. The lease was for a term of 25 years, due to expire on November 1, 2004. Under the terms of the lease, Twickenham was to pay Locomotion rent in the amount of $1,000,625.00, payable in monthly installments of $5,416.67, as well as ad valorem taxes and costs of insurance.

Concurrently with the execution of the lease, the principals of TSI and their wives executed a Guaranty Agreement, guaranteeing the performance of the lease terms. The guaranty is in two parts: one page contains the signatures of the three principals of TSI and their wives, including the Debtors. The second page contains the signatures of the three principals and the wives of the two non-debtor principals. (Locomotion Ex. 4) Both parties agree that Mrs. Clements was not present at the time of the execution of the guaranty. (Tr. at 35, 71). Locomotion contends that Mrs. Clements signed the guaranty at some later date, but when that date was and where that took place were never testified to and no evidence was presented on that point. Mrs. Clements disputes the fact that the signature on the guaranty is hers, claiming that she never signed the guaranty, even though the signature resembles hers. (Tr. at 21–22) Mr. Clements testified that he did not sign Mrs. Clements' name to the guaranty, nor did she authorize anyone else to sign her name. (Tr. at 35). Mr. Clements admits that he did sign his name to the guaranty and that the signature on the guaranty admitted into evidence is his. (Tr. at 34).

Whether or not the signature on the guaranty agreement is that of Mrs. Clements is a matter of factual dispute between the parties. Locomotion offered the testimony of a handwriting expert, Lamar Miller, at the hearing. Mr. Miller testified that upon examination of the guaranty agreement, his expert opinion was that the handwriting on the guaranty was the same signature as that on several handwriting specimens said to be Mrs. Clements' handwriting. These specimens include a signature on Answers to Request for Production of Documents and an Affidavit in Opposition to a Motion for Summary Judgment filed in a state court proceeding, bearing the typed name of Mrs. Clements with a signature above it. (Tr. at 126). Mr. Miller testified that, in his opinion, the handwriting on the guaranty agreement was the same as that on the "known" handwriting samples of Mrs. Clements. (Tr. at 128). However, not once was Mrs. Clements ever asked if the "known" handwriting samples were indeed signed by her. The signature on the handwriting samples was labeled "Nell Clements," and the documents were court documents signed under penalty of perjury; however, there is a gap in the chain of proof, because Locomotion's attorney never established by testimony or otherwise, that the handwriting on the "known" samples was indeed that of

Mrs. Clements. All the Court learned from the handwriting expert is that, in his opinion, the signature on the guaranty matched a signature on other documents, filed in some other court proceeding.

The premises which housed the restaurant consisted of a building structure, to which was attached an old railroad car, which was used as a dining room for the restaurant. (Tr. at 41). The railroad car contained approximately 40 seats for patrons of the restaurant. The entire restaurant contained approximately 250 seats for patrons, so the railroad car contained approximately 16 percent of the total seating for the restaurant. (Tr. at 43) The rail car was removed from the premises in 1990, at the request of the subtenant. (Tr. at 95). It is currently being leased to someone else, at another site, for $500 per month. (Tr. at 95) TSI had no objection to the removal of the railroad car. (Tr. at 114) No credit is being given TSI as an offset for the removal of the rail car, or for the rent received from the current rail car lessee. (Tr. at 95) The Debtors were not notified of, nor asked to consent to, the removal of the rail car from the premises. (Tr. at 93)

TSI occupied the leased premises for a period of years until the mid–1980's, when it ceased operating as TSI. (Tr. at 100) The property was then vacant for some period of time while Locomotion made efforts to re-let the premises by listing it with realtors. (Tr. at 100). TSI then sub-leased the property to at least one restaurant proprietor by a sublease dated September 6, 1990. (Locomotion Ex. 7). Simultaneously, a Tri–Party Option agreement was signed by Locomotion and the sub-tenant, giving the sub-tenant a purchase option, which indicates to the Court that Locomotion knew of, and consented to, the sub-lease. (Locomotion Ex. 7). There was some reference made to other sub-tenants at the hearing, but if there were other sub-tenants, who they were, and when their sub-leases were in effect, was never made clear to the Court. What is clear, evidenced by a spreadsheet prepared by Locomotion's accountant, is that the last rent received for the property was on April 28, 1993. (Locomotion Ex. 18). A sub-tenant was apparently allowed to pay a reduced rent, because Locomotion's Exhibit 18 shows rent was paid from April 15, 1992 to April 28, 1993 in the amount of $3800 per month. Exhibit 18 shows that the last full payment of rent was received on April 15, 1992.

There were other arrearages on the lease, dating back to when the restaurant still operated as TSI, evidenced by several letters sent to the Debtors as guarantors of the lease. (Locomotion Exbs. 5, 6, 9, 12). The last letter sent to the Debtors was dated August 10, 1992, notifying the Debtors as guarantors, that the lease was in default.

According to the testimony of Mr. Robert Clark Sledge, General Partner of Locomotion, Locomotion never accepted TSI's abandonment of the property as a termination of the lease. (Tr. at 115). He further testified that Locomotion never took any action that it considered would terminate the lease, and that the lease is still in effect today. (Tr. at 112).

State court litigation was initiated against the Debtors by Locomotion in September, 1992. Debtors filed their bankruptcy petition on September 2, 1994, before the state court litigation had gone to trial. The bankruptcy has stayed any further litigation in state court.

## CONCLUSIONS OF LAW

■ Objections to claims are governed by 11 U.S.C. § 502(a) which provides that, "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects." Section 502(b) provides, "... [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount...." Federal Rule of Bankruptcy Procedure 3001(f) provides that a proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." The burden of proof is on the objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim.

However, the burden of ultimate persuasion rests with the claimant." *In re VTN, Inc.,* 69 B.R. 1005 (Bankr.S.D.Fla.1987), *citing, In re DeLorean Motor Co. Litigation,* 59 B.R. 329 (E.D.Mich.1986).

In their Proposed Findings of Fact and Conclusions of Law submitted after the hearing, Debtors argue three main points as to why the claim is not valid. The first is that, since Mrs. Clements allegedly did not sign the guaranty agreement, she is not a guarantor of the lease; secondly, that a material modification of the lease terminated the guaranty agreement, and lastly that Locomotion did not exercise due care in attempting to re-let the property after TSI's default. The Court will address each of these arguments in turn.

■ First, it is a major issue of factual dispute as to whether or not Mrs. Clements signed the guaranty agreement. Mrs. Clements contends that she did not sign the guaranty, and that the signature on the guaranty is not hers, even though it resembles hers. Locomotion argues that she did sign the guaranty, although they concede that she was not present at the time the guaranty was executed. Although much time and evidence was spent on this at the hearing, the issue of whether or not Mrs. Clements did or did not sign the guaranty is immaterial to this Chapter 13 case. Debtors admit as much in their Proposed Findings of Fact and Conclusions of Law submitted to the Court. This is a Joint Debtor Chapter 13 case. Regardless of whether the claim is that of the Debtors jointly, or the claim is owed by one of the Debtors individually, it is paid out of the Chapter 13 plan proceeds. Since Mr. Clements admits that he did sign the guaranty agreement, the debt is at least owed by him individually, if not jointly by both Debtors. It makes no difference to the Objection to Claim whether or not Mrs. Clements signed the guaranty or not. Therefore, the Court refuses to rule on the factual issue of whether or not the signature on the guaranty is that of Mrs. Clements.

■ The second basis of the Debtors' Objection is that a material modification was made to the leased premises by the removal of the railroad car which served as a dining room for the restaurant. Since the Debtors did not receive notice of the removal of the railroad car, nor did they consent to it, the Debtors argue that it constitutes a material modification of the principal obligation without the consent of the guarantor, which would in turn, release the guarantor from his obligation.

■ "A material alteration or departure from the contract of guaranty of a lease, without the guarantor's consent, will discharge the guarantor, whether or not the guarantor is prejudiced thereby." 49 Am. Jur.2d *Landlord and Tenant* § 822 (1995). The Debtors are correct in their argument that a material modification of the lease can discharge guarantors from their obligation. However, one must examine what is considered a "material alteration" to the contract. "A material alteration of a lease within the meaning of such rule occurs where an agreement is made between the lessor and lessee changing the term of the lease, or the time for the payment of rent, or, in some cases, changing the amount of the rent payable." *Id.* One can see from this laundry list of factors, that the material modification that discharges a guarantor is essentially a change to the *terms of the contract,* not a mere change to the physical premises governed by the lease. It is fundamental contract law that a change to the terms of the contract without the consent of all of the parties, discharges the obligations under the contract. The removal of a physical object from the property premises is not a change to the terms of the contract. The law of guaranty is the same as that quoted above for the law of landlord and tenant. "Alterations of the contract between debtor and creditor which have the effect of releasing or discharging the guarantor are various in character. They have been held to include the addition of a new party, a change in the place of payment, a change in the method of payment, an increase in the rate of interest which the debtor is obligated to pay to the creditor, a change of the place where suit may be brought against the debtor, and a curtailment of a factor's power of sale." 38 Am.Jur.2d *Guaranty* § 82 (1995).

■ Moreover, "if the guaranty contract contains a provision which contemplates or authorizes a change in the terms of the principal contract, a change within the scope of such authorization does not discharge the guarantor." 38 Am.Jur.2d *Guaranty* § 83 (1995). The guaranty agreement itself between the Debtors and Locomotion states, "... such Lease Agreement may be *modified* and extended from time to time whether or not Guarantor has notice thereof." (Locomotion Exb. 4) (Emphasis added) The plain language of this guaranty agreement clearly "contemplates a change in the terms of the" lease. Even if a serious modification to the lease contract itself had been made, such as those listed above, these Debtors/Guarantors would *not* be discharged, because the guaranty agreement, that they signed, allowed changes to the contract without notice to the guarantors. This Court does not believe that the removal of the railroad car, *at the request of the sub-tenant,* and with the consent of TSI, constitutes a material modification to the lease agreement that would discharge the Debtors. Additionally, if the Court were to find that the removal of the dining car was a material alteration, the guaranty agreement signed by the Debtors, clearly authorizes such alterations without notice or consent of the guarantors.

■ The final point of Debtors' argument is that Locomotion did not exercise due care in attempting to re-let the property after TSI's default, and as a consequence its damages ought to be reduced. Paragraph 17 of the lease (Locomotion Exb. 3) is entitled "Remedies Upon Default." It provides in pertinent part,

> In the event of default by Lessee under this lease, Lessee shall not be relieved of Lessee's obligation to make the monthly payment of rent and other payments herein reserved, at the times and in the manner provided. In such event, Lessor *may* rent the leased premises, as agent for and in the name of Lessee, at any rental and for any term readily obtainable.... It is understood that the Lessor will exercise due diligence and act in good faith in releasing or reletting the premises, and also

in incurring expenses pertaining to same. (Locomotion Exb. 3) (Emphasis added)

> "When a tenant abandons the leased premises prior to the expiration of the term agreed upon in the lease, it is the lessor's option to allow the premises to remain vacant and sue the tenant on the contract of renting.... There is no duty on the lessor to re-let the premises for the benefit of the lessee when the lessee has abandoned the leased premises in violation of the lease." *Crestline Center v. Hinton,* 567 So.2d 393, 396 (Ala.Civ.App. 1990). A landlord has no duty to actively try to re-let property after the default of a tenant. It is the tenant's responsibility to make the payments under the lease. The landlord has no duty to mitigate damages on behalf of the tenant.

■ The lease in the case at bar does not impose such a duty on Locomotion. It merely states that Locomotion *may* re-let the premises upon the default of TSI; it does not say Locomotion *shall* re-let the premises. Moreover, the lease states that Locomotion is to exercise due diligence and good faith in "releasing or reletting the premises," meaning Locomotion could not unreasonably withhold consent to a prospective new tenant upon the default of TSI. There was testimony at the hearing from the general partner of Locomotion, that the property was listed with realtors and that Locomotion let it be known that the property was for lease, once TSI dissolved in the 1980's. (Tr. at 100). In fact, a sub-tenant was obtained for a period of time at a reduced rental fee, which it should be pointed out is expressly authorized by the plain language of the lease agreement ("... Lessor may rent the leased premises, ... at any rental and for any term readily obtainable ..."). It appears to the Court that Locomotion did fulfill its obligations under the lease in regards to re-letting the property. They did make efforts to re-let the premises. They did not allow it to just sit vacant without making some efforts to solicit a new tenant. Locomotion even made accommodations for the sub-tenant it did obtain by removing the railroad car, at the sub-tenant's request, incurring expenses of some $15,000 for the removal. (Tr. at 115) Incurring expense of approximately $15,000 would seem to be a clear fulfillment of the "good

faith and due diligence" requirement of the lease; even perhaps above and beyond the call of the duty required. The Debtors' contention that the claim should be reduced because Locomotion did not exercise good faith and due diligence in re-letting the property is without merit.

The Court has addressed each of the three arguments put forth by the Debtors as to why the claim is not valid. The Court has not found any of the arguments to be persuasive. Accordingly, the Court concludes that the proof of claim filed by Locomotion is valid. Now, the amount of the claim must be determined.

The governing code section is 11 U.S.C. § 502(b)(6) which states that the Court should determine the amount of a claim,

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

"Section 502(b)(6) was designed to compensate a landlord for his loss due to breach of a lease, yet preclude a claim so large as to prevent other general unsecured creditors from recovering a reasonable dividend from the estate." *In re Thompson,* 116 B.R. 610, 612 (Bankr.S.D.Ohio 1990). Although the language of § 502(b)(6) does not expressly mention guarantors, case law has firmly established that it applies to guarantors of leases in bankruptcy, as well as lessees. *See, Hippodrome Building Co. v. Irving Trust Co.,* 91 F.2d 753 (2d Cir.1937) (holding that the corresponding section of § 502(b)(6) of the Bankruptcy Act of 1898 applies to guarantors, as well as lessees); *In re Revco D.S., Inc.,* 138 B.R. 528 (Bankr.N.D.Ohio 1991) (holding that § 502(b)(6) does apply to guarantors); *In re Interco Inc.,* 137 B.R. 1003 (Bankr.E.D.Mo.1992) (holding that § 502(b)(6) applies to guarantors in bankruptcy). Thus, it is clear that the Court must apply § 502(b)(6) to the claim of Locomotion.

Section 502(b)(6) requires that the Court determine the amount of the claim by adding together any unpaid rent due under the lease, either on the petition filing date, or the date the lessee surrendered, or the lessor repossessed the property, whichever is earlier. This sum must be added to the figure arrived at by calculating the rent due for the remainder of the lease, for either one year or 15%, not to exceed three years, of the remaining term of the lease, following either the petition filing date or the date of surrender or repossession.

Obviously, to make this calculation, the first thing which must be determined is whether the lessor repossessed or the lessee surrendered the property prior to the petition filing date. If this occurred that date must be used in arriving at these calculations, rather than the petition filing date. The general partner of Locomotion testified at the hearing that Locomotion never accepted TSI's abandonment of the property as a termination of the lease; and that as far as Locomotion was concerned, the lease was still in effect on the petition filing date. (Tr. at 115). The Debtors never offered any evidence to the contrary. There was some mention of TSI dissolving in the mid-eighties, but there was never any clear proof as to this, and what effect it had on the lease. The rent was paid up until April of 1993, either by TSI or by sub-tenants. The Debtors never offered any testimony or other evidence that TSI tried to abandon the property or turn the keys back over to Locomotion. Accordingly, the Court must find that Locomotion never repossessed the property or that TSI ever abandoned the property; and therefore, the lease was still in effect on the petition filing date. Consequently, the petition filing date of September 2, 1994 will be

used in calculating the amount of the claim under § 502(b)(6).

The next step is calculating the amount due under § 502(b)(6)(A) which is the rent remaining for the term of the lease, for the greater of one year or 15% of the total remaining term, not to exceed three years. The calculation would be thus:

Term: September 2, 1994 (petition filing date) to October 2004 (end of lease term) = 122 months.

Rent per month = $5,416.67

122 months × $5,416.67 = $660,833.74

$660,833.74 × 15% = $99,125.06

The first part of the calculation would thus be $99,125.06.

Next, the amount due for the default up until the petition filing date under § 502(b)(6)(B) must be determined. In their Proposed Findings of Fact and Conclusions of Law submitted to the Court, each party performed the calculation under § 502(b)(6), and managed to arrive at numbers which are approximately $50,000 apart. The difference in the parties' numbers was due to the amount each determined was due prior to the petition filing date. Debtors simply determined how much of the actual rent payment was in default, whereas Locomotion added in amounts for taxes, maintenance, insurance and attorney's fees, which resulted in a figure $50,000 higher than that of the Debtors. Whether the added costs of taxes, maintenance, insurance and attorney's fees can be added to the rent payment for the claim under § 502(b)(6) is another issue for the Court to determine.

The code does speak in terms of the lessor's "damages," but when setting out the calculation to be used, simply uses the word "rent" and does not speak in terms of other damages. However, the lease at issue in this case, specifically made the lessee responsible for paying the taxes, insurance, and maintenance on the property. In fact, paragraph 8(d) of the lease states,

It is the intent of Lessor and Lessee that rent herein specified shall be absolutely net to the Lessor in each month during the term of this lease ...; that all taxes, charges, improvements and other assessments, and all costs, expenses and obligations of every kind relating to the demised premises as provided in the lease which may arise or become due during the term ... shall be paid by Lessee.... Lessee shall and will and does hereby expressly agree to pay all such sums as *"additional rent."* (Emphasis added) (Locomotion Exb. 3)

This language makes it clear that the monthly payment of $5,416.67 was a net payment, and that all sums due for the other expenses were considered "additional rent." Furthermore, paragraph 21 of the lease, entitled "Attorney's Fees" states that,

In the event of any default by Lessee and the subsequent employment by Lessor of any attorney for the collection of any amount due hereunder or for the institution of any suit filed for the purpose of enforcing the correction of any default hereunder or seeking possession of the leased premises, or on account of bankruptcy proceedings by or against Lessee, ... Lessee agrees to pay and shall be taxed with a reasonable attorney's fee for the services of such attorney. (Locomotion Exb. 3)

The fundamental American Rule of attorney's fees requires the underlying contract to expressly provide for attorney's fees. This lease spells out the obligation for attorney's fees very precisely. In addition, the guaranty agreement itself does not limit itself to merely guaranteeing the rental payment, but instead expressly states that the guarantors are responsible for "expenses incurred by things to be performed thereunder by Lessee...." (Locomotion Exb. 4).

The legislative history of § 502(b)(6) is instructive because it states that the landlord's "allowed claim is for his *total damages,* as limited by this paragraph ..." H.R. 95–595 to accompany H.R. 8200, 95th Cong. 1st Sess. (1977) pp. 353–355. (Emphasis added). Moreover, case law supports the idea that the landlord's claim is not limited to merely the rent under the lease. "The damage cap [§ 502(b)(6)] applies to all damages,.... Thus, as a matter of law, the actual damage claim of the [landlord] for termination of the

lease, whether for non-payment of rent, taxes, costs, attorney's fees, or other financial covenants, are limited by the damage cap in § 502(b)(6)(A)." *In re Storage Technology, Corp.,* 77 B.R. 824 (Bankr.D.Colo.1986).

As a result, the Court is persuaded that all sums due under the lease at the time of the filing of the petition, should be included as part of Locomotion's claim. According to Locomotion Exb. 18 which is a balance sheet prepared by Locomotion's accountant, as of September 2, 1994, $31,021.29 had been paid by Locomotion on legal expenses, taxes, insurance and maintenance expenses. Locomotion Exb. 18 also shows that as of December, 1994 $320,716.89 should have been paid in rent under the lease. The spread sheet shows that $189,600.08 had actually been paid. The difference between those two figures is $131,116.81. Discounting the figure back to the petition date by subtracting four payments for September, October, November and December gives a total default figure of $109,450.13. Adding the rental default and the amount paid for expenses gives a total figure under § 502(b)(6)(B) of $140,471.42. Adding that number to the figure of $99,-125.06 under § 502(b)(6)(A) results in a total claim of $239,596.48. Hence, the total proof of claim for Locomotion should be $239,-596.48.

A separate order will be entered in accordance with the foregoing.

### ORDER SUSTAINING IN PART AND OVERRULING IN PART DEBTORS' OBJECTION TO CLAIM # 6 OF LOCOMOTION PROPERTIES, LTD.

This case is before the Court upon an Objection to Claim # 6 of Locomotion Properties, Ltd, filed by the Debtors (Doc. No. 19). Pursuant to Findings of Fact and Conclusions of Law separately entered, it is

**ORDERED:**

Debtors' Objection to Claim # 6 of Locomotion Properties, Ltd. is sustained. However, the claim will be allowed in the amount of $239,596.48 as an unsecured claim.

**DONE AND ORDERED.**