In re SOUTHERN CINEMAS, INC., a Florida corporation, d/b/a StarNet Cinemas, Inc., f/k/a Kent Enterprises, Inc., Kent Theatres, Inc., Kent Amusements, Inc., Spotlight Cinemas, Inc., and Plaza 3 Theatres, Tax ID# 59–0900689, Debtor.

No. 00–01551–3P1.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Dec. 12, 2000.

522

Martin Bailey, Knoxville, TN, for R.C. Cobb ("Cobb").

David E. Otero, Jacksonville, for Southern Cinemas ("Debtor").

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DEBTOR'S OBJECTION TO CLAIM NO. 7 OF R.C. COBB, INC.*

GEORGE L. PROCTOR, Bankruptcy Judge.

This case came before the Court upon Debtor's Objection to Claim No. 7 of R.C. Cobb on a guaranty of a commercial lease. On August 16, 2000, the Court held a hearing at which the parties presented stipulated facts as to all issues. The Court provided the parties with the opportunity to tender briefs in support of their arguments. Upon the parties' submissions, the Court enters the following Findings of Fact and Conclusions of Law.

### *FINDINGS OF FACT*

1. On January 26, 1990, PBB/Columbia, Ltd. ("PBB"), as landlord, and R.C. Cobb, Inc. ("Cobb"), as tenant, entered into a Lease Agreement ("Lease"). (Ex. 1(A).)

2. The subject of the Lease is real property in Columbia, South Carolina upon

which a movie theatre ("Capitol 8 Theatre") is located.

3. Pursuant to a Lease Assignment, Assumption and Consent Agreement dated December 10, 1993 ("Lease Assignment"), the Lease was assigned to and assumed by Kent Cinemas, Inc. ("Kent Cinemas"). (Ex. 1(B).)

4. On February 9, 1994, Kent Enterprises, Inc. ("Debtor") gave Cobb a Guaranty. (Ex. 1(C).)

5. On December 31, 1996, Kent Cinemas dissolved pursuant to § 607.1403 of the Florida General Business Corporation Act. (Ex. 1(D).)

6. On or about the date of its dissolution, Kent Cinemas wound up and liquidated its business and affairs and ceased its corporate existence.

7. Pursuant to a Lease Assignment dated December 31, 1996 ("Second Lease Assignment"), the Lease was assigned from Kent Cinemas to Debtor. (Ex. 1(E).)

8. Debtor and Kent Cinemas were never the same corporation. Debtor never was known nor did the Debtor ever conduct business as Kent Cinemas, which existed as a separate legal entity.

9. From the time of the Second Lease Assignment of December 1996 until December 1999, Debtor made rent payments to PBB with Kent Enterprises, Inc. checks. PBB never objected, never maintained this was a breach of the Lease, nor notified Debtor or Cobb that it was terminating the Lease as a result.

10. The last rent payment made by the Debtor was in December 1999. PBB, through its agent Edens & Avant Realty, Inc., sent a letter to Sarah Homer, then an officer of Debtor, on January 17, 2000, requesting the January rent from Kent Theatres, Inc. (which was previously merged into Debtor) for the Capitol 8 Theatre. (Ex. 1(F).) To date, Debtor has not received any other communication from PBB regarding the Lease or the Capitol 8 Theatre. PBB has not filed suit against the Debtor or asserted a claim in this bankruptcy.

11. On January 30, 2000, Debtor closed the Capitol 8 Theatre. The Debtor has not reopened and does not intend to reopen the Capitol 8 Theatre.

12. On January 31, 2000, Debtor abandoned and surrendered the Capitol 8 Theatre to PBB. The Debtor has not exercised any possessory rights since that time.

13. On February 2, 2000, PBB, through its agent Edens & Avant, sent Cobb a demand for payment of past due rent in the amount of $58,326.80. (Ex. 1(G).) To date, Cobb has not received any other communication from PBB concerning the Lease or the Capitol 8 Theatre nor has PBB brought suit against Cobb regarding the Lease or the Capitol 8 Theatre. Cobb has not paid any money to PBB on the Lease since it was assigned to Kent Cinemas on December 10, 1993.

14. On February 24, 2000, Debtor changed its name from Kent Enterprises, Inc. to Southern Cinemas, Inc.

15. On February 29, 2000, Debtor filed its petition for relief under Chapter 11 ("Filing Date"). Debtor has continued as debtor-in-possession and is now operating its business and managing its property. No committee has been appointed.

16. The Debtor was in default under the Lease prior to the Filing Date. Specifically, the Debtor owed PBB $29,163.40 as of the Filing Date.

17. The Lease was rejected by the Debtor and approved by order of this Court on May 2, 2000 ("Order"). Pursuant to the Order, PBB was required to file its claim for rejection damages with the clerk by June 6, 2000. PBB also received notice of the claims bar date, which was also June 6, 2000. PBB failed to file a

timely claim and has not filed a claim to date. The Debtor's schedules list PBB as the holder of an uncontested, non-priority unsecured claim in the amount of $29,163.40. This amount will be paid to PBB plus interest at the prime rate over five years pursuant to the Debtor's Amended Plan of Reorganization which was confirmed on July 11, 2000.

18. The Debtor's schedules show Cobb's claim as being contingent, unliquidated, and disputed. Cobb filed a timely general, non-priority, unsecured claim for $1,863,000.00 ("Claim"). Debtor filed an objection to the Claim. Cobb contests the Debtor's positions.

19. If the Claim is allowed in whole or in part ("Allowed Claim"), the Allowed Claim shall be reduced by the amount of any judgment entered in favor of the Debtor in the pending adversary proceeding entitled *Southern Cinemas, Inc. v. R.C. Cobb;* Adversary Proceeding Number 00–212.

20. If 11 U.S.C. § 502(b)(6) applies to the Allowed Claim, the maximum amount of the Allowed Claim will not exceed $313,875.00.

### CONCLUSIONS OF LAW

 11 U.S.C. § 502 governs the allowance of claims or interests in a bankruptcy case. 11 U.S.C. § 502 (West 2000). A proof of claim or interest is considered prima facie evidence of its validity and extent and is deemed allowed unless a party in interest objects. § 502(a); Fed. R. Bankr.P. 3001(f). The burden of proof rests upon the objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim. However, the burden of ultimate persuasion rests with the claimant." *In re Clements,* 185 B.R. 895, 898–99 (Bankr.M.D.Fla.1995) (citing *DeLorean v. Allard (In re DeLorean Motor Co. Litig.),* 59 B.R. 329, 337 (E.D.Mich.1986)).

Cobb filed a general unsecured claim for $1,863,000.00 based on Debtor's guaranty of the lease assignment. Debtor objects to the claim on the grounds that it was relieved from its duty as guarantor because Kent Cinemas, the primary obligor, dissolved and is no longer liable under the Lease Assignment. Additionally, Debtor posits that the application of 11 U.S.C. §§ 502(c) and 502(e)(1) precludes collection of the debt.

The following issues are presented before the Court:

1. Does Alabama or Florida law control the construction and interpretation of the Guaranty?

2. Is Cobb's claim unenforceable pursuant to 11 U.S.C. § 502(b)(1) for any of the following reasons:

 a. Did the dissolution of Kent Cinemas automatically terminate its obligations as assignee under the Lease Assignment?

 b. Is a corporate dissolution a material modification?

 c. Must PBB first make a demand upon Cobb before Cobb can demand payment from Debtor, the guarantor?

 d. Did the lease terminate when Kent Enterprises surrendered the property to PBB?

3. Does 11 U.S.C. § 502(e)(1) bar Cobb's claim against Debtor?

4. Does 11 U.S.C. § 502(c)(1) bar Cobb's claim against Debtor?

5. Does 11 U.S.C. § 502(b)(6) cap the claim of an assignor against a guarantor of a lease?

*1. Does Alabama or Florida law control the construction and interpretation of the Guaranty?*

 Cobb has asserted a claim against Debtor based on the Guaranty, which Debtor executed to secure the payment obligations of the primary obligor, Kent Cinemas. The Guaranty does not enunciate a choice of law provision in the event of a dispute between the parties. On the

face of the contract, therefore, it is unclear whether Alabama or Florida law will govern the interpretation and construction of the contract. Where a contract is silent in regards to an issue, the court must infer the parties' intent. *See Valley Cement Indus. v. Midco Equip. Co.,* 570 F.2d 1241, 1242 (5th Cir.1978) ("In interpreting parties' contract, court is bound to give effect to intentions of parties; such intentions are to be drawn as much as possible from language of agreement, but where agreement is silent on the issue, court may turn to extrinsic evidence for support.")

 In contract actions, both Alabama and Florida adhere to the traditional presumption of *lex loci contractus. New York Life Ins. Co. v. Scheuer,* 198 Ala. 47, 73 So. 409, 411 (1916); *Brown v. Case,* 80 Fla. 703, 86 So. 684, 684 (1920). This rule dictates that a contract is governed by the place it is made or performed. However, the parties to a contract may stipulate that the laws of another jurisdiction will control the construction and interpretation of the document. Fla. Stat. ch. 671.105 (1999); *New York Life,* 73 So. at 411. The preference for contractual autonomy is generally upheld unless the resulting agreement violates the public policy of the state of enforcement or if the chosen jurisdiction bears no reasonable relation to the parties or the transaction. *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson–Ingram Dev. Co.,* 642 F.2d 744, 751 (5th Cir.1981); *Cherry, Bekaert & Holland v. Brown,* 582 So.2d 502, 506 (Ala.1991). This rule permits multistate contractants to rely upon the law of their choice to govern their transaction, irrespective of the law of the jurisdiction which chances to hear their suit.

 The Guaranty was executed in the state of Florida. (Ex. 1(C).) Applying the rule of *lex loci contractus,* it appears that Florida law controls. However, the Guaranty is not a fully integrated document since it incorporates the provisions of the Lease Assignment. The Guaranty states in pertinent part, "[Debtor] ... guarantees

to Cobb the full, prompt and complete performance of all of the covenants and obligations of Kent Cinemas under the Lease Assignment." (Ex. 1(C).) The Guaranty must therefore be read in conjunction with the Lease Assignment. The Lease Assignment clearly designates Alabama as the controlling state law: "This Assignment shall be governed by the laws of the State of Alabama and shall be construed in accordance with such laws." (Ex. 1(B) at 4.) Since the Guaranty adopts the "covenants and obligations" of the Lease Assignment, the parties must have intended for the contract to be construed pursuant to Alabama contract law. Accordingly, the Court finds that Alabama state law will control the construction and interpretation of the Guaranty.

### 2. Is Cobb's claim unenforceable pursuant to 11 U.S.C. § 502(b)(1)?

 A guaranty protects a creditor against loss caused by the failure of the primary obligor to perform its duties. Generally, a guaranty agreement consists of a promise to answer for the debt of another. 38 Am.Jur.2d *Guaranty* § 1 (1999). In this manner, the guaranty offers the creditor recourse against two separate parties thereby reducing the creditor's risk of loss. Although a guaranty is distinct from the primary contract, it is a collateral agreement to the debt itself and its provisions can only be triggered by the default of the primary obligor. *See id.* Thus, if the principal obligation is extinguished, so too is the guarantor's obligation.

 Alabama courts recently considered the extent of a guarantor's liability on a lease. *See Ex parte Kaschak,* 681 So.2d 197 (1995). In *Kaschak,* the Alabama Supreme Court stated:

"In order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation is due, and if for any reason the debtor is not bound to

make payment to the creditor, then the creditor may not hold the guarantor liable."

*Id.* at 201 (citing 38 Am.Jur.2d *Guaranty* § 77 (1968)). Because the guaranty is a conditional promise, the accountability of the guarantor first requires a finding of liability upon the primary contract. *See* Am.Jur.2d *Guaranty* § 2 (1999). Consequently, the Court must find that Kent Cinemas, the obligor, is liable on the contract before the burden can attach to Debtor, the guarantor.

Section 502(b)(1) provides that a claim will not be allowed if it is "unenforceable against the debtor and the property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (West 2000). Following the rule of law articulated in *Kaschak,* the Court must establish the primary liability of Kent Cinemas in order to determine the obligations of Debtor. Debtor asserts that the Guaranty is not an enforceable claim for several reasons: (a) Kent Cinemas is no longer the assignee under the Lease Assignment because the company has been dissolved, (b) the Lease Assignment has been materially modified, (c) PBB, the original lessor, has failed to demand payment from Cobb, and (d) the Lease Assignment was terminated when the premises were surrendered to PBB by Kent Enterprises.

*a. Did the dissolution of Kent Cinemas automatically terminate its obligations as assignee under the Lease Assignment?*

Debtor contends that Kent Cinemas has been released from the lease contract by virtue of its dissolution. This, in turn, discharges Debtor's obligations pursuant to the Guaranty making it an unenforceable claim under § 502(b)(1). Debtor's argument depends on the conclusion that the dissolution of Kent Cinemas terminated all of its business and liabilities.

At common law, dissolution of a corporation was akin to its civil death—"not only could the corporation not be thereafter sued, but pending suits against it abated." *In re Rego Co.,* No. 11651 slip op. 1081, 1089 (Del. Ch. Oct. 22, 1992). Any claims that a creditor may have had died along with the dissolved corporation. Consequently, the common law endorsed a corporation's dissolution to dissolve for the purpose of eliminating its current and future creditor obligations. In response to the harsh effects of the common law upon creditors, states enacted statutory provisions whereby corporations continued for the limited purpose of "winding up" corporate affairs. *See id.* These statutes extended the corporate life of a dissolved company for a specific period post-dissolution to allow defunct corporations to maintain and defend lawsuits. *See id.* at 1090.

Florida law, which governs the dissolution of Kent Cinemas, has followed the modern statutory policy. *See* Fla. Stat. ch. 607.1405 (1999). Chapter 607.1405 maintains that corporate existence can continue until a dissolved corporation has wound up its business and affairs. ch. 607.1405. Approved purposes include collecting its assets; disposing of property that will not be distributed to shareholders; discharging or making provisions to discharge its liabilities; distributing remaining assets to its shareholders; and doing any other act necessary for it to wind up and liquidate its business and affairs. ch. 607.1405(1). More importantly, the statute expressly notes that "[d]issolution of a corporation *does not* ... [p]revent commencement of a proceeding by or against the corporation ... [or a]bate or suspend a proceeding pending by or against the corporation on the effective date of dissolution...." ch. 607.1405(2)(e)-(f) (emphasis added). Additionally, chapter 607.1406 institutes the scheme by which a dissolved corporation may dispose of the claims against it as well as the procedure for creditors to follow to collect their claims. ch. 607.1406.

The presence of chapters 607.1405 and .1406 strongly suggests that Florida law allows a corporation to temporarily exist beyond dissolution. The Court's review of the relevant statutes indicates that the Florida legislature did not intend for a corporation's debts to disappear upon dissolution, as Debtor suggests. On the contrary, the statutes afford creditors, both present and future, an opportunity to avoid loss on account of a corporation's dissolution. The Court finds that pursuant to Florida Statutes, neither Kent Cinemas nor its existing or future liabilities ceased to exist when the company dissolved. Rather, the interruption of the lease by virtue of Kent Cinemas' corporate dissolution and Kent Enterprises' bankruptcy resulted in a breach of contract.

Debtor argues further that even if Kent Cinemas continued its corporate existence beyond the effective dissolution date, continuing a lease "with over five years remaining is not within the scope of allowed business for a dissolved corporation." (Debtor's Br. at 11.) Chapter 607.1406(5) provides that the dissolved entity must provide any claimant holding a "contingent, conditional or unmatured debt [with] security ... sufficient to provide compensation to the claimant if the claim matures." ch. 607.1406(5). Cobb held a contingent debt when Kent Cinemas dissolved. Kent Cinemas provided security to Cobb, as required by Florida law, in the form of a guaranty, which subsequently secured the Second Lease Assignment. *See* discussion *infra* Part 2b. Cobb did not reject the offer of security and was therefore "deemed to have accepted such security as the sole source from which to satisfy [the] claim against the [defunct] corporation." ch. 607.1406(5). Since a claim has now emerged against Kent Cinemas, Cobb is justified in satisfying its claim by asserting its rights in the security.

In addition to statutory language that holds a dissolved obligor and its guarantor responsible for corporate debts, the Lease Assignment clearly contemplates and provides for such a contingency: "The undersigned, does hereby guarantee to Cobb the full, prompt and complete performance by Kent Cinemas of its obligations as Lessee of all and singular the covenants, conditions and provisions in said Lease contained on the part of Kent Cinemas ...." (Ex. 1(C) at 2.) Where the terms of a contract are unambiguous, it is the court's duty to analyze and determine the meaning of the contract. *Gov't St. Lumber Co. v. AmSouth Bank, N.A.,* 553 So.2d 68, 75 (Ala.1989). A guarantor may not defeat the plain terms of the agreement by stating that he did not intend to obligate himself to the provisions of the guaranty agreement. *Id.* Absent fraud in the inducement, a guaranty will be enforced according to its terms. *Id.* Since Debtor alleges neither ambiguity nor fraud in the agreement, the Court must abide by the clear and certain terms of the Guaranty. The Guaranty binds Debtor to the covenants of the contract if Kent Cinemas fails to do so. To hold that Debtor is not liable as guarantor simply because the primary obligor has ceased to exist would contradict the very purpose of the guaranty contract.

Debtor also posits that upon assignment of the lease to Kent Enterprises, Kent Cinemas was no longer liable upon the Lease Assignment. Alabama case law holds that "the liability of the assignee of a lease is founded solely upon privity of estate, and that he may relieve himself of all subsequent liability for the payment of after-accruing rent by reassigning the term and thereby terminating his privity of estate with the lessor." *Johnson v. Moxley,* 216 Ala. 466, 113 So. 656, 657 (1927). However, this rule of law controls only where the assignee has not assumed any of the obligations of the lease. "[A]n assignee who assumes the covenants of the lease is liable to the lessor for performance and cannot evade his liability for the rent by a reassignment of the lease and surrender of possession." *Ed-*

*wards v. Altmayer*, 31 Ala.App. 459, 18 So.2d 471, 473 (1944). The Lease Assignment executed by the parties indicates that Kent Cinemas agreed to assume the covenants of the original lease.[1] (Ex. 1(B) at 3.) Where an agreement exists, the intention of the parties will prevail over the default rules of law.

The Court finds that the Debtor's position is inconsistent with legal principles regarding corporate dissolution and the contractual provisions of the Guaranty. *See Boston Box Co. v. Rosen*, 254 Mass. 331, 150 N.E. 177, 178 (1926) (holding that the dissolution of a corporate lessee does not release its guarantor under the lease); *see also* 49 Am.Jur.2d *Landlord and Tenant* § 830 (1995). For the reasons stated, the Court holds that Debtor is not released from its liability as guarantor on account of the corporate dissolution of Kent Cinemas.

### b. Is a corporate dissolution a material modification?

 Debtor further argues that material modifications in the Lease Assignment exonerate Debtor from its obligation under the Guaranty and render the claim unenforceable under § 502(b)(1). A guarantor can be released from liability if the terms of the underlying contract are modified without the guarantor's consent: "It is fundamental contract law that a change to the terms of the contract without the consent of all of the parties, discharges the obligations under the contract." *In re Clements*, 185 B.R. 895, 899 (Bankr.M.D.Fla.1995). The guarantor's release is predicated on its right to rely upon the risks and benefits of the original underlying contract. *See* 38 Am.Jur.2d *Guaranty* § 82 (1999).

Debtor charges that the corporate dissolution of Kent Cinemas is a risk-altering modification. Although Kent Cinemas'

dissolution certainly creates a high level of risk for the guarantor, it is not a bilateral change to the terms of the contract. Cobb neither participated in the dissolution nor agreed to terminate the Lease Assignment. The dissolution of Kent Cinemas cannot be a material modification of the contract if one of the parties was ignorant of the change.

 Debtor also believes that a material modification of the Lease Assignment occurred when Kent Cinemas assigned the lease to Kent Enterprises. An assignment constitutes a material modification since it changes the terms of the contract, namely, the identity of one of the parties. Such a change would warrant a release of the guarantor. 38 Am.Jur.2d *Guaranty* § 82 (1999). However, the guarantor's discharge may be denied where the guarantor knew of and participated in the event which increased the risk. *See* 38 Am.Jur.2d *Guaranty* § 85 (1999). In this case, Debtor was the very same entity that assumed the lease from Kent Cinemas. Debtor obviously knew of and participated in the alteration of the contract. Debtor should not now be permitted to assert the defense of material modification and avoid guarantor liability when it was partly responsible for the change. Therefore, the Court does not find that there has been a material modification of the contract that would warrant releasing the guarantor from its obligation.

### c. Must PBB first make a demand upon Cobb before Cobb can demand payment from Debtor, the guarantor?

 Debtor asserts that Cobb's claim is also unenforceable under § 502(b)(1) because the Guaranty is contingent upon PBB, the landlord, first demanding payment from Cobb. PBB's position is irrelevant in the Court's analysis of

---

1. *Section 3. Assumption.* Assignee hereby accepts the foregoing assignment and assumes and agrees to pay, perform, discharge and otherwise be and remain responsible for all obligations, liabilities and indebtedness of Assignor as Tenant under the Lease on and after the date hereof. (Ex. 1(B) at 3.)

whether Debtor is liable upon the guaranty contract. The Guaranty states that it shall be "absolute, continuing and unlimited." (Ex. 1(C) at 2.) An absolute guaranty is an "unconditional undertaking by guarantor to pay debt at maturity if [the] principal does not." *Shur–Gain Feed Div. William Davies Co. v. Huntsville Prod. Credit Ass'n,* 372 So.2d 1317, 1320 (Ala. Civ.App.1979) (quoting *Huckaby v. McConnon & Co.,* 213 Ala. 631, 105 So. 886 (1925)). The terms of the Guaranty are absolute and do not condition the guarantor's payment upon a demand from PBB. Where the terms of the contract are clear and unambiguous, they are presumed to express the intent of the parties. 38 Am. Jur.2d *Guaranty* § 66 (1999). The Court finds that a demand by PBB is not necessary in order for Cobb's right to payment to become effective.

### d. Did the lease terminate when Kent Enterprises surrendered the property to PBB?

 Debtor's final argument under § 502(b)(1) is that the lease was terminated when Kent Enterprises surrendered the property to PBB. A guarantor is discharged from its liability under a guaranty if the creditor releases the principal. 38 Am.Jur.2d *Guaranty* § 1 (1999). A release may be effected by the termination of the lease through the primary obligor's surrender of the property to the creditor. *See Kaschak,* 681 So.2d at 200. Debtor argues that Kent Enterprises surrendered the lease (thereby terminating the contract) when it abandoned the property on January 1, 2000.

 Alabama law holds that when a tenant abandons leased premises, the landlord may either (a) allow the premises to remain vacant and collect rent for the whole term, or (b) end the lease by accepting the abandoned property and re-entering the premises. *Id.* If the landlord accepts surrender of the premises by the tenant, the tenant is relieved of any future obligation or liability for future rent. *See id.*

 A surrender of a lease may occur either through an express or implied agreement between the landlord and tenant. *See McClure v. Daniel,* 45 Ala.App. 558, 233 So.2d 500, 502–03 (1970). An express agreement requires that both parties explicitly consent to the acceptance of the surrender. *See Shahan v. Herzberg, Simpson & Co.,* 73 Ala. 59 (1882). Once the surrender is approved, the lease is terminated and the parties are no longer bound by its covenants. *Id.* There is no evidence in the record indicating that an express surrender occurred.

 Where an express agreement is lacking, the question is resolved by looking to the intent of the parties. *See McClure,* 233 So.2d at 502–03; *Newman v. Spann,* 602 So.2d 901, 902 (Ala.Civ.App. 1992). Pursuant to Alabama law, a surrender which will effectuate a termination of the lease must clearly manifest the will of the parties. *See McClure,* 45 Ala.App. at 561–62, 233 So.2d 500 (finding that the lessor's attempt to relet the premises after an abandonment and the acceptance of keys and their use for entering the premises to inspect or repair does not constitute an acceptance of surrender by the lessor). An implied intention to terminate the lease can be demonstrated if the landlord has acted in a way that is inconsistent with the rights of the tenant. *See Ryals v. Laney,* 338 So.2d 413, 416 (Ala.Civ.App.1976) ("A sale of the abandoned leasehold may constitute evidence of acceptance of the abandonment.").

 Since the landlord did not expressly accept Debtor's surrender, the Court must search the landlord's conduct for any inconsistency with Debtor's continuing rights under the lease from which an acceptance of surrender may be inferred. The stipulation of facts submitted by the parties does not show that PBB acted inconsistently with the possessory rights of Kent Enterprises. On the con-

**532**

trary, PBB sent a payment demand to Cobb subsequent to Kent Enterprises' abandonment of the premises. Furthermore, no documents were produced to prove that PBB actually terminated the lease. These facts indicate that PBB did not intend to accept a surrender of the property and terminate the lease. In conclusion, the Court does not find any cause under 11 U.S.C § 502(b)(1) to declare the Guaranty unenforceable.

*3. Does 11 U.S.C. § 502(e)(1) bar Cobb's claim against Debtor?*

■■■ 11 U.S.C. § 502(e)(1) directs courts to "disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on, or has secured, the claim of a creditor, to the extent that ... such creditor's claim against the estate is disallowed [or] such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim...." 11 U.S.C. § 502(e)(1) (West 2000). Debtor argues that this section bars Cobb's claim because both Debtor and Cobb are liable upon the same debt, which is the lease from PBB.[2]

■■■ A co-debtor and a direct creditor are vastly different entities. Collier on Bankruptcy ¶ 502.05 (15th ed.1989). A co-debtor, or surety, holds a different status from a creditor in that it has no right to share in distributions from the estate until it pays the underlying creditor in full: "A claim of a surety is contingent, in this context, until the surety pays the principal creditor and thereby fixes his own right to payment from the debtor." *Id.* According to the legislative history of § 502(e), Congress sought to prevent both the creditor and surety from receiving payment on the same debt. H.R.Rep. No. 95–595, at 354 (1977); S.Rep. No. 95–989, at 65 (1978),

U.S.Code Cong. & Admin.News 1978, p. 5787; *see also Syntex Corp. v. Charter Co.,* 862 F.2d 1500, 1502 (11th Cir.1989) ("[T]he bankrupt's estate should not be burdened by estimated claims contingent in nature. Rather, the debtor should be expeditiously rehabilitated and reorganized, thereby providing the bankrupt a fresh start, while simultaneously according fair treatment to creditors by paying ascertainable claims as quickly as possible."). Thus, a co-debtor does not have a right to share in the distribution of the estate until the creditor's claim is paid in full, thereby making the co-debtor's claim contingent. Collier on Bankruptcy ¶ 502.05 (15th ed.1989). Once the debt is paid by the co-debtor, the claim is no longer contingent and the co-debtor may step into the shoes of the creditor and collect the debt.

Debtor, however, is confusing the basis upon which Cobb's claim is founded. Cobb is not suing Debtor based upon its designation as a co-debtor, but rather as a creditor. Although Debtor and Cobb may both be liable on the same debt where Debtor is assignee and Cobb is assignor, they are not jointly liable on the guaranty contract where Debtor is surety and Cobb is creditor. "[S]ection 502(e)(1) does not apply when the debtor is liable to one party and that party, in turn, is liable to others." Collier on Bankruptcy ¶ 502.06(2)(b) (15th ed., rev.1999). Since § 502(e)(1) only applies to a suit by a co-debtor, the provision does not invalidate Cobb's standing as a direct creditor. Additionally, there is little fear of double-dipping in the estate since PBB has not filed a claim. To the extent that PBB has already been provided for in Debtor's confirmed plan, Debtor may deduct such payment from the amount due under the

**2.** The Court will not discuss at length the disallowance of Cobb's claim under § 502(e)(1)(A) which states that a claim of a co-debtor or surety will be denied to the extent that the "[primary] creditor's claim ... is disallowed." 11 U.S.C. § 502(e)(1)(A) (West

2000). This argument fails for the same reason that § 502(e)(1)(B) is inapplicable— namely, Cobb's claim pursuant to the Guaranty is independent of PBB's claim upon the Lease.

Guaranty.[3]

The parties have stipulated that if 11 U.S.C. § 502(b)(6) applies, the maximum amount of the Allowed Claim will not *exceed* $313,875.00. Neither party has offered the Court a formula and figure to use in the event that § 502(b)(6) applies. The Court will therefore calculate the amount of the Allowed Claim pursuant to the formula designated by § 502(b)(6):

*Section 502(b)(6) Cap*—The greater of:

A. One Year's Rent—$324,000.00

 12 months at $ 27,000.00

OR

B. 15% of the balance of the time under the Lease Assignment—$242,346.75

 Use the earlier of:

 1. Date of the filing of bankruptcy petition—February 29, 2000

 2. Date of abandonment of property—January 31, 2000

 Time remaining on lease—January 31, 2000 to January 26, 2005—4 years, 11 months, 26 days

 Amount due for time remaining on lease—$1,615,645.16

PLUS

C. Any unpaid rent on the earlier of such dates—$27,000.00

MINUS

D. Deductions from such claim— $29,163.40

 Payment to PBB through confirmed plan, see discussion *supra* Part 3— $29,163.40

E. Amount of Allowed Claim under § 502(b)(6)—$321,836.60

| | |
|---|---|
| One year's rent = | $324,000.00 |
| Unpaid Rent = | + $ 27,000.00 |
| Deductions = | - $ 29,163.40 |
| Total = | $321,836.60 |

F. Lesser of Stipulated Allowed Claim and Allowed Claim under § 502(b)(6) = *$ 313,875.00*

**3.** The payment due under the Guaranty is at all times equivalent to the amount due on the Lease to PBB. Since Debtor's confirmed plan

*4. Does 11 U.S.C. § 502(c)(1) bar Cobb's claim against Debtor?*

 11 U.S.C. § 502(c) provides that "[t]here shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which ... would unduly delay the administration of the estate." 11 U.S.C. § 502(c) (West 2000). This section serves two purposes—first, it avoids the need to await the resolution of pending lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions, and second, it promotes a fair distribution to creditors through a realistic assessment of uncertain claims. *Matter of Ford,* 967 F.2d 1047, 1053 (5th Cir.1992). However, in cases where a claim is neither contingent nor unliquidated, estimation is simply inappropriate. *In re Continental,* 981 F.2d 1450, 1461 (5th Cir.1993).

*a. Is Cobb's claim "contingent"?*

 A guaranty is a classic example of a contingent obligation. *In re Barnett,* 42 B.R. 254, 256 (Bankr.S.D.N.Y.1984). Specifically, Cobb's claim against the Debtor is contingent upon non-payment by Kent Cinemas, the primary obligor. Neither the Bankruptcy Code nor the courts have defined a "contingent claim" and explained how it should be employed under § 502(c)(1). *Ford,* 967 F.2d at 1051. The traditional definition of contingent, however, is based upon the debtor's "present duty or liability to pay." *Id.* In the present case, the primary obligor defaulted thereby triggering Debtor's payment obligations under the Guaranty.

Debtor asserts, though, that the Guaranty will remain a contingent debt until PBB makes a demand upon Cobb. However, "where a contract was entered into by parties who did not contemplate that any

already provides for $29,163.40 to PBB, the Guaranty must reflect that payment in its balance.

further act had to be completed in order to trigger contractual liability, then such liability would not be contingent." *In re Lambert,* 43 B.R. 913, 922 (Bankr.D.Utah 1984). The parties agreed to an absolute and unlimited guaranty—upon default of the principal on the underlying debt, liability on the guaranty became fixed. Consequently, liability on the guaranty is no longer contingent because all predicates to enforcement have occurred.

### b. Is Cobb's claim liquidated?

 Section 502(c)(1) may also be employed if a debt is unliquidated. A claim is liquidated "when ... the amount due may be ascertained by computation or reference to the contract out of which the claim arises." *In re Flaherty,* 10 B.R. 118, 120 (Bankr.N.D.Ill.1981). More concisely, where a debt is liquidated, only the amount of the liability and not its existence, remains a question. *In re Teigen,* 228 B.R. 720, 723 (Bankr.D.S.D.1998) (citing *United States v. Verdunn,* 89 F.3d 799, 802 (11th Cir.1996)).

 Debtor argues that its debt is unliquidated because the amount Cobb owes to PBB is still unknown. The Court, though, does not find any uncertainty as to liability or amount. At the time of Kent Enterprises' bankruptcy filing, Debtor became liable for the full amount of the Guaranty regardless of the possibility that Cobb's debt to PBB would be forgiven. The Court therefore concludes that the debt is neither contingent nor unliquidated for purposes of § 502(c)(1).

### 5. Does 11 U.S.C. § 502(b)(6) cap the claim of an assignor against a guarantor of a lease?

The parties also dispute the amount of the claim that is due to Cobb, if it is due at all. Section 502(b)(6) disallows a claim to the extent that:

> such claim is the claim of a lessor for damages resulting from the termination of a lease of real property [and] such claim exceeds—

> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

> (i) the date of the filing of the petition; and

> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates ....

11 U.S.C. § 502(b)(6) (West 2000). Although the language of § 502(b)(6) neither includes nor excludes claims of a lessor against a guarantor of a lease, case law strongly indicates that the cap applies to guarantors of leases in bankruptcy, as well as lessees. *See In re Clements,* 185 B.R. 895, 901 (Bankr.M.D.Fla.1995) ("Although the language of § 502(b)(6) does not expressly mention guarantors, case law has firmly established that it applies to guarantors of leases in bankruptcy, as well as lessees."); *Arden v. Motel Partners (In re Arden),* 176 F.3d 1226, 1227 (9th Cir.1999) ("We hold that the Cap, which limits a lessor's claim for damages resulting from termination of a lease, is applicable to a debtor/guarantor."); *Oldden v. Tonto Realty Corp.,* 143 F.2d 916, 923 (2d Cir.1944) ("[W]here a guarantor or surety of the lease ... is itself in process of reorganization ... the landlord's claim must be limited in the same way as if the claim were against the estate of the bankrupt estate of the lessee."). *But see In re Danrik,* 92 B.R. 964, 971 (Bankr.N.D.Ga.1988) (holding that § 502(b)(6) did not apply to a guarantor of a lease where unsecured creditors were fully provided for in the plan and debtor had escrowed more than the amount of creditor's claim).

 The main crux of Debtor and Cobb's dispute, however, is whether § 502(b)(6) applies to assignors of leases. Cobb argues that the section has no application since it is not a lessor of property.

The unique fact pattern of this case raises a question of first impression for this Court. Although it is a settled matter that a cap can apply to a lessor's claim against a guarantor, it is unclear whether a cap can also be applied to an *assignor's* claim against a guarantor.

 This issue must be resolved by looking at the legislative history of the provision. The rationale of the legislature was succinctly explained by the Second Circuit:

> When one claimant is a landlord holding a long-term lease, its single unsecured claim ... of future rent could devour so much of the debtor's estate that only crumbs could be left for the other unsecured creditors. Recognizing the potentially distorting effect of claims arising out of long-term leases, Congress capped unsecured claims for future rent at one year. This allows landlords to recover some of their losses from a bankrupt tenant, but sees to it that their recovery will not crowd out the claims of competing creditors.

*Nostas Assocs. v. Costich (In re Klein Sleep)*, 78 F.3d 18, 20 (2d Cir.1996) (citations omitted); *see also Clements*, 185 B.R. at 901 ("Section 502(b)(6) was designed to compensate a landlord for his loss due to breach of a lease, yet preclude a claim so large as to prevent other general unsecured creditors from recovering a reasonable dividend from the estate."). The purpose of the statute evidently was to preserve a portion of the estate for unsecured creditors whose claims would otherwise be greatly diluted. This rationale is easily applicable to both lessors and assignors alike.

Cobb may argue that the reasoning of the legislature does not apply here since the unsecured creditors in this case are already being paid in full pursuant to Debtor's confirmed plan. However, courts have repeatedly held that a consideration of the equities is inappropriate where the legislature has already spoken. *See In re Episode USA, Inc.*, 202 B.R. 691, 693–96

(Bankr.S.D.N.Y.1996); *In re Farley, Inc.*, 146 B.R. 739, 748 (Bankr.N.D.Ill.1992); *In re Interco, Inc.*, 137 B.R. 1003, 1006–07 (Bankr.E.D.Mo.1992); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 817 (S.D.Ohio 1991). This Court does not see fit to carve out a special exception for assignors where the legislature and courts have denied such an exception to similarly situated lessors.

Additional justifications have also been offered in support of a cap on a lessor's claim. First, the amount of a lessor's damages due to a breach of a real estate lease is often difficult to prove. *Federated Dep't Stores*, 131 B.R. at 818 *citing* S.Rep. No. 95–989, at 62–65 (1978). Second, since the property is usually returned to the lessor upon breach by the tenant, a lessor can mitigate its damages by re-renting the premises. Most other creditors cannot mitigate their damages as easily, if at all. Ronald S. Orr & James A. McDougal, *The Debtor's View of Chapter 11 in a Case Involving Real Property, in Practicing Law Institute* 91, 118, *available at* WL 390 PLI/Real 91. These justifications do not differentiate between a lessor and assignor. Damages would be difficult to prove in either case and an assignor would have the same opportunity as a lessor to relet the premises in the event of defaulting tenant.

 Cobb, nevertheless, argues that a literal reading of the statute only limits claims of lessors and not assignors. Although the plain meaning of legislation ought to be conclusive, such a reading may be bypassed where the literal application of the statute will produce a result that conflicts with the intention of its drafters. In such an instance, the intention of the drafters, rather than the strict language, will control. *United States v. Ron Pair Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The intention of the drafters in § 502(b)(6) was clearly to avoid large, mitigative claims in order to enable the estate to provide for unsecured

creditors.[4] To circumvent the purpose of the statute on account of "labels" would encourage crafty drafters to invent relationships that fall outside the scope of the lessor-lessee contract and limit the reach of § 502(b)(6). The Court seeks to prevent manipulation of statutory language by looking to the nature of the relationship, rather than the words used, to determine the rights and responsibilities of the parties. The Court therefore finds the distinction drawn by Cobb between "lessor" and "assignor" to be meaningless, and holds that § 502(b)(6) can cap the claim of an assignor against a debtor-guarantor.

## CONCLUSION

Debtor has not met the burden of proof necessary to rebut the prima facie effect of the claim filed by Cobb. Cobb's claim is allowed but will be capped pursuant to 11 U.S.C. § 502(b)(6). Accordingly, the Court must deny Debtor's Objection to Claim No. 7 and will require Debtor to provide for Cobb's claim through its confirmed plan in the amount of $313,875.00. This figure shall be adjusted by the amount of any judgment entered in favor of the Debtor in the pending adversary proceeding entitled *Southern Cinemas, Inc. v. R.C. Cobb*, as stipulated by the parties. A separate Order will be entered in accordance with these Findings of Fact and Conclusions of Law.

---

4. Debtor correctly asserts that Alabama law does not require a lessor to mitigate damages. *Crestline Ctr. v. Hinton*, 567 So.2d 393, 396 (Ala.Civ.App.1990). However, § 502(b)(6) clearly gives a court the authority to lower the damage award in the hopes that the lessor will be able to recover its loss by reletting the premises. 11 U.S.C. § 502(b)(6) (West 2000). Where federal and state law conflict, the rules of federal law will prevail. *Geier v. American Honda Motor Co.*, 529 U.S. 1913, 1935, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) ("We have recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively ... or when state law is in actual conflict with federal law.") (citations omitted).