Plaintiff Pine Plaza Joint Venture (hereinafter "Pine Plaza") instituted this action to recover overdue rent on a building leased to defendant Jerry Frank Bazzel. The trial court granted a directed verdict in favor of Pine Plaza both on the complaint and on Bazzel's counterclaim. Bazzel appeals from the resulting judgment. We affirm. *Page 911 
We note at the outset that the standard for granting a directed verdict is the same as that for granting a summary judgment. If there is even a scintilla of evidence to support the position of the opposing party, a directed verdict is improper. Rule 50 (e), Ala.R.Civ.P.; Deaton, Inc. v. Burroughs,456 So.2d 771 (Ala. 1984). The movant must demonstrate that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. Ex parte Bennett,426 So.2d 832 (Ala. 1982); Houston v. McClure, 425 So.2d 1114 (Ala. 1983). On appeal, after a directed verdict, this Court must examine the record to determine if there was any evidence to support the theory of the opposing party; if so, that would render the directed verdict improper. Reynolds v. McEwen,416 So.2d 702 (Ala. 1982).
The record shows the following facts: Bazzel operated a furniture store in Mobile. In December, 1981, he leased a building in a shopping center owned by Pine Plaza for a term of three years and six months, beginning on February 1, 1982. Prior to signing the lease, Bazzel inspected the premises several times and noticed several defects, which he pointed out to Joey Betbeze, who negotiated the lease for Pine Plaza. Betbeze promised to repair the defects, which included covering a trough around the walls inside the building, painting the walls, and replacing a small piece of broken glass. In addition, apparently in an effort to make the premises more attractive to Bazzel, Betbeze pointed out that the building had a new roof.
Bazzel occupied the building on February 10, 1982. On this day he discovered that Pine Plaza was covering the trough with plywood rather than filling it in with cement, as he had assumed Pine Plaza would do. However, Betbeze never indicated that Pine Plaza would fill in the trough with cement, and Bazzel accepted the work.
Sometime before March 10, 1982, it rained heavily in Mobile and Bazzel discovered that the roof of the leased building leaked badly. He complained to Betbeze, who sent a crew to repair the roof. However, the roof continued to leak every time it rained. Bazzel testified that during the year he occupied the building, $60,000 worth of furniture was damaged by rain water which flooded the building as a result of the leaking roof.
Bazzel vacated the building in February 1983 and refused to pay rent after that date. On March 1, 1984, Pine Plaza sold the building and sued Bazzel, claiming rent from February 1983, to March 1984. Bazzel answered, contending that the premises were rendered "wholly untenantable" and that the lease was void because he had been fraudulently induced to sign it. He also filed a counterclaim seeking money damages for fraud. At the close of the evidence, the trial court directed a verdict in favor of Pine Plaza for the full amount of the rent claimed and for attorneys' fees, and against Bazzel on his counterclaim.
The lease between Bazzel and Pine Plaza contains the following provisions:
 "Nothing herein contained shall be construed as a warranty that said premises are in good condition or are fit or suitable for the use or purpose for which they are let. The Lessor or Lessor's agent have made no representation or promises with respect to said building or the demised premises except as herein expressly set forth.
 "Lessor shall not be obligated or required to make any repairs or do any work on or about said premises, or any part thereof, or any equipment therein. However, Lessor reserves the right after reasonable notice and at any time to enter upon said premises by himself, his workmen, contractor, architect, artisans and laborers, to make such repairs and to do such work on or about said premises as Lessor may deem necessary or proper, or that Lessor may be lawfully required to make, and such repairs shall be made at the Lessee's own risk as to his goods, wares, fixtures, equipment, stock, furnishings, etc. as to protection thereof from theft or damages or other hazard directly or indirectly connected with such repair work. *Page 912 
 "If the building herein demised is destroyed to the extent that same is rendered wholly untenantable by fire, windstorm, riot, insurrection or other cause, without fault of Lessee, such destruction shall cancel the lease, and rent shall be payable only to the time of such destruction. If the rented premises shall be damaged by fire, windstorm, riot, insurrection or other cause, without fault of the Lessee, then, and in that event, the Lessor shall have the option within thirty days from the time such damage shall have occurred to elect whether Lessor shall or shall not repair and restore said building to its original shape and condition, and the Lessee shall be notified of such election in writing. If Lessor elects to repair and restore the damaged building as aforesaid, lessor shall make such repairs as soon thereafter as is practicable upon exercising all reasonable diligence, and from the time such damage occurs until the repairs are completed, an equitable abatement of rent shall be allowed. If Lessor elects not to repair said building, there shall be an equitable abatement of rent allowed until such time as the Lessor may make said repairs, as aforesaid, PROVIDED, HOWEVER, that upon the Lessor electing not to make such repairs the Lessee may, at his own expense, make same, and in that event the said abatement of rent shall continue for the duration of the original term, or until the Lessor shall have repaid the Lessee the reasonable costs of such repairs, plus interest thereon at Six (6%) per centum per annum from the date of completion of such repairs, or whichever event shall first occur. On demand, the Lessee shall furnish the Lessor an itemized statement of expenses of such repairs." (Emphasis added.)
Bazzel contends that the building was rendered untenantable, within the terms of the lease, because Pine Plaza failed to repair the roof so that it did not leak. We disagree.
Cambron v. Carlisle, 406 So.2d 865 (Ala. 1981), involved contract provisions similar to those quoted above. The defendants claimed that they were not liable for rent because the building they leased from plaintiff was rendered unfit for their business because of fire damage. This Court stated:
 "The trial court found that the fire rendered the building `entirely unfit for use for the purposes' for which it was leased and declared the lease null and void.
 "Cambron contends that the trial court's construction of the lease was erroneous and that the decision is contrary to the great weight of the evidence.
 "To make the lease null and void the building must have been `entirely destroyed or rendered entirely unfit or incapable of being used for the purpose for which the same [was] let. . . .' It is clear from the record that the building was not entirely destroyed. The evidence shows there was little if any structural damage to the building. There was evidence that some concrete blocks on one wall were replaced. One interior wall was burned and there was a small hole in the ceiling. However, all four walls remained standing and the roof remained intact. The question presented is whether the trial judge's finding that the building was `entirely unfit' is supported by the evidence.
 "Having not found an Alabama case speaking directly to this issue, we looked to decisions of other jurisdictions. The case of Barry v. Herring, 153 Md. 457, 138 A. 266 (1927), is very similar to the present case. In Barry, Herring leased the first floor in a three-story building to use as a place of business. The lease contained the following provisions: `If the property shall be destroyed or rendered untenantable by fire, the tenancy shall be thereby terminated, and all liability for rent hereunder shall cease upon payment proportionately to the [day] of fire or unavoidable accident.' A fire damaged the building and the lessor sought to terminate the lease under the above provision. The lease was for five years with an option to extend it for five *Page 913 
additional years. At the time of the fire, there were five years remaining on the lease because Herring exercised his option to extend the lease. In holding that the lease was not terminated, the court stated:
 "`It is fairly well settled by the authorities that where a lease contains a provision like the one before us in this case, made primarily for the benefit of the lessee, and the leased building is destroyed or rendered untenantable, the tenancy is thereby terminated if to restore such building it becomes necessary to rebuild it, thereby depriving the tenant of its use. But where the building may be restored by ordinary repairs made thereon with no considerable interruption to the tenant's business while the same are being made, the tenancy is not terminated or the lease forfeited.
 "`In determining whether the repairs are ordinary repairs, and the interruption temporary only, the value of the property, as well as the duration of the lease, may be taken into consideration.
 "In Barry, the damage consisted of burned joists supporting the first floor of the building. The ceiling and side walls were burned and damaged by water. The furnace, heating pipes and electrical wiring were also damaged by fire and water. Hence, under similar circumstances as in the present case, the Maryland court held the lease was not terminated. Also in accord is 51C C.J.S. Landlord and Tenant § 99 (2)(b) (1968), wherein it is stated:
 "`. . . Partial damage to, or destruction of, the building does not of itself terminate a lease which provides for its termination if the premises are destroyed, or damaged so as to be unfit for occupancy, and this is true, although the premises, or a part of them, are rendered temporarily untenantable for the purpose of the lease.
 "The majority of the damage done to the building leased by Cambron was to the interior of the building. The ceiling was damaged by fire and water. The interior paneling was burned, as was the electrical wiring. The estimates as to the costs of repairs were approximately $30,000. The lease was not to expire for another eight years. Cambron had paid $125,000 for the business and was paying $1,200 per month as rent. In order to purchase the business Cambron had obtained a $100,000 loan from Birmingham Trust National Bank. Approximately $70,000 of the loan remained unpaid at the time of the trial. The repair time estimates ranged from thirty to ninety days with the majority of the testimony indicating that the repairs could be completed in thirty days.
 "We conclude that the trial court either misconstrued the applicable law or that its finding is not supported by the evidence. Because the premises were not rendered `entirely unfit,' it follows that the lease was not void."
Cambron v. Carlisle, 406 So.2d at 866-67.
Similarly, the lease in this case provided that if the leased building was "rendered wholly untenantable," the lease was cancelled. As this Court in Cambron stated, quoting Barry v.Herring, supra, this language means that "the tenancy is thereby terminated if to restore such building it becomes necessary to rebuild it, thereby depriving the tenant of its use."
The evidence presented in this case indicates that the roof leaked before Bazzel occupied the building. Even assuming that the building was damaged by one of the causes set out in the quoted lease provision, Bazzel was only entitled under the lease either (1) to repair the roof himself and charge Pine Plaza for the cost of the repairs, or (2) to take an abatement of rent until Pine Plaza made the repairs. He was not entitled to terminate the lease.
Bazzell also contends that the lease was void because Betbeze had fraudulently induced him to enter it, and that the trial court erroneously directed a verdict against him on this issue. *Page 914 
We have reviewed the evidence before the trial judge, and we are of the opinion that the trial judge did not err.
Bazzel testified that Betbeze promised that the trough around the inside walls of the building would be filled in. He also testified as follows:
 "Q. Did he [Betbeze] represent to you what would be done about that trough?
 "A. We did not have specifics. He told me that he would fill in the trough. I thought he meant with cement, you know, to fill it back up like the floor and tile over it.
"Q. Uh-huh.
 "A. But I accepted it later when they plywooded it in."
Bazzel also testified that Betbeze told him that "the roof would be repaired in such a manner as to stop leakage." However, the record shows that Betbeze did not know that the roof leaked until after Bazzel had occupied the building. Bazzel testified:
 "Q. You are not telling [us] that Mr. Betbeze knew the roof was leaking prior to leasing the premises to you?
"A. No, no."
Therefore, it is apparent that Bazzel's contract could not have been induced by the alleged representation.
Further, Bazzel admitted that Betbeze made no representation regarding the roof's quality. The record shows the following:
 "Q. Okay. Did he mention anything about the quality of the roof or anything?
"A. Just a new roof."
Therefore, we are of the opinion that the trial judge did not err in directing a verdict on the issue of fraudulent inducement to enter the lease with Pine Plaza.
We have reviewed Bazzel's other contentions of error and find them to be without merit. The judgment of the trial court is due to be, and it hereby is, affirmed.
AFFIRMED.
TORBERT, C.J., and ALMON, SHORES and BEATTY, JJ., concur.