681 So.2d 197 (1996)
Ex Parte Anthony KASCHAK.
(Re Joe G. CROMEANS v. PARKWAY MEATS, INC., et al.).
1950498.
Supreme Court of Alabama.
June 7, 1996.
Rehearing Denied July 19, 1996.
*198 William W. Tally of Tally & Tally, Scottsboro, for petitioner Anthony Kaschak.
Gerald R. Paulk of Livingston, Porter & Paulk, P.C., Scottsboro, for respondent Joe G. Cromeans.
INGRAM, Justice.
In 1990, Joe Cromeans, the owner of Jackson Square Shopping Center in Jackson County, rented two commercial spaces to Parkway Meats, Inc. William Bennett signed the lease as president of Parkway Meats. Anthony Kaschak signed the lease between Cromeans and Parkway Meats as *199 guarantor of the lease payments. Parkway Meats defaulted on the lease. Cromeans relet the property to new tenants, offering the new tenants free occupancy for a period as an inducement to enter into the lease. The trial court entered a judgment in favor of Cromeans and against Parkway Meats, William and Illa Bennett, and Kaschak, separately and severally, for rent owed up until the time the lease was terminated and the property was relet to the new tenants. The Court of Civil Appeals reversed the judgment of the trial court, holding that Kaschak, the guarantor, was liable for additional rent beyond the termination of the lease and up until the time the new tenants actually began paying rent, regardless of the date the new leases began. Cromeans v. Parkway Meats, Inc., 681 So.2d 194 (Ala.Civ.App.1995). We granted Kaschak's petition for certiorari review.
In 1989, William Bennett became interested in leasing property from Cromeans to use for the operation of a custom meat market. Cromeans agreed to lease Bennett property in Jackson Square Shopping Center if Bennett found someone to guarantee payment of the rent called for by the lease. Anthony Kaschak agreed to sign as Bennett's guarantor.
On March 29, 1990, Cromeans and Parkway Meats, Inc., a corporation controlled by Bennett, executed a five-year lease, by which a business operated by Parkway Meats would occupy Units 9 and 10 of the shopping center. Bennett signed the lease as president, and Bennett and his wife, along with Kaschak, also signed as guarantors on a separate guaranty of lease agreement. The monthly rental on Unit 9 was $1,130.21 and the monthly rental on Unit 10 was $904.17.
Bennett paid Cromeans one month's rent in advance as a deposit and was allowed two free monthsi.e., two months' occupancy without rentto help him pay for "fixturing." His first rent payment was due on June 1, 1990. Bennett paid only four additional months' rent. Bennett's business failed, and he closed his store on December 31, 1990. Bennett performed work and gave goods and materials to Cromeans, for which he received a $5,358.83 credit against rent.
Upon learning that Bennett would soon be vacating the property, Cromeans began looking for new tenants. On January 18, 1991, Cromeans entered into a new lease agreement with R & R Foods, Inc., on Unit 10 for use as a Little Caesar's restaurant. However, R & R Foods was not required to pay rent until October 1, 1991. On March 29, 1991, Cromeans entered into a new lease agreement with Peh Kiang Chia on Unit 9; Chia was to use that unit for the Kim San Chinese restaurant, but Chia was not required to pay rent until September 1, 1991.
Cromeans sued the Bennetts, Parkway Meats, and Kaschak for the difference between the amount Bennett had paid on the rent due for Units 9 and 10 and the amount that would have been paid on those units, at the rate agreed to by Bennett, up until the time the new lessees actually began paying rent.
The trial court held that the actions of Cromeans between the end of December 1990 and March 29, 1991, constituted an acceptance of Bennett's abandonment of the property and a re-entry by Cromeans and, thus, that the lease had been terminated. Therefore, the trial court held that the Bennetts and Kaschak were responsible for rent (less any credits) on Unit 9 from July 1, 1990, through March 29, 1991, and on Unit 10, from July 1, 1990, through January 18, 1991. In other words, the trial court held that Bennett and Kaschak were responsible for paying the rent up until the time Cromeans entered into new leases. Cromeans moved to alter, amend, or vacate the judgment, arguing that the judgment award was inadequate. The trial court granted his motion in part, conceding that the monthly rent owed by Bennett and Kaschak was to begin June 1, 1990, rather than July 1, 1990. As to any remaining issues, the motion was denied.
The Court of Civil Appeals reversed, stating that this case did not involve the simple breach of a lease agreement. Rather, it held, the trial court erred in failing to address the guaranty agreement and its ramifications on the actions of the parties. The Court of Civil Appeals, quoting 38 C.J.S. Guaranty § 69 (1943), stated that "`[w]here *200 the guaranty is an absolute one for rent for premises leased for a certain business, the guarantor is not discharged because the tenant is prevented from carrying on such business.'" 681 So.2d at 197. The Court of Civil Appeals stated that the terms of the guaranty agreement were clear and unambiguous and that Kaschak's liability would "not be affected by any repossession of the leased premises by the Lessor." 681 So.2d at 197. Cromeans sought to recover for rents and expenses through September 1, 1991, on Unit 9 and through October 1, 1991, on Unit 10. The Court of Civil Appeals held that if Cromeans had not allowed the new tenants to occupy the units without paying rent, then he would not have been able to secure the new leases and that not securing the new leases would have increased the liability of Bennett and Kaschak. Therefore, the Court of Civil Appeals reversed the judgment and remanded the case for the trial court to recalculate the rent owed to Cromeans.
Kaschak argues that it is illogical for a guarantor of a lease to remain liable when, as a matter of law, the original lessee is discharged. He further contends that the Court of Civil Appeals erred in holding that the guarantor's obligation under the lease guaranty continued even though the lease was terminated and the lessee owed no further rent. Kaschak maintains that this Court has never dealt specifically with the question whether the termination of the underlying lease also terminates a lease guaranty.
The trial court and the Court of Civil Appeals correctly held that when a tenant abandons leased premises the landlord has two options. First, the landlord may allow the premises to remain vacant and recover rent for the whole term of the lease, or the landlord may end the lease by accepting the abandoned property and re-entering the premises. Ryals v. Laney, 338 So.2d 413 (Ala.Civ.App.1976). Furthermore, the landlord is under no affirmative duty to mitigate any damages arising under default on a lease agreement by a tenant. Whether a landlord has accepted a tenant's abandonment of leased premises, so as thereby to terminate the lease, is a question of fact, and an acceptance may be implied from acts and conduct of the landlord. Cobb v. Lee, 44 Ala.App. 277, 207 So.2d 143 (1968). McClure v. Daniel, 45 Ala.App. 558, 233 So.2d 500 (1970). Mere acceptance of keys to leased premises, standing alone, does not manifest an intention on the part of the landlord to terminate a lease. Ryals, supra. In this case, the trial court held that the landlord had accepted the tenant's abandonment of the premises. Therefore, the trial court held that the lease as it related to Unit 10 was terminated on January 18, 1991, and as to Unit 9 was terminated on March 29, 1991.
We find no Alabama cases specifically dealing with the issue presented in this case. We must first look to the language in the guaranty agreement to determine if something in that language would obligate the guarantor beyond the termination of the lease between Bennett and Cromeans.
Section 1 of the guaranty agreement provides, in pertinent part, the following:
"Guarantor hereby unconditionally and absolutely guarantees to Lessor the prompt and full payment of rent and all other sums due to Lessor under said lease and the prompt and complete performance of all covenants contained in said lease on the Lessee's part to be performed."
Section 4 of the agreement provides:
"Guarantor agrees that the Guarantor's obligation to make payment in accordance with the terms of this Guaranty shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Lessee or its estate in bankruptcy ... resulting from the operation of any present or future provision of the National Bankruptcy Act, other similar statute, or from the decision of any court. The liability of Guarantor shall not be affected by any repossession of the leased premises by Lessor."
(Emphasis added.)
It is this emphasized language that the Court of Civil Appeals relied upon in extending the liability of the guarantor beyond that of the original lessee. We do not believe that *201 this language extends the guarantor's liability. Rather, it simply means that the guarantor may still be liable for anything that the lessee may be held liable for, even if the lessor repossesses the property.
The guaranty agreement in this case is an unconditional one. Because the guaranty agreement secures a principal or primary obligation, the liability of the guarantor also depends upon a construction and application of the primary contract. 38 Am. Jur.2d Guaranty § 73 (1968). As the Court of Civil Appeals correctly noted, the terms of the guaranty agreement control the obligations of the guarantor. However, we note that when a contract of guaranty is unconditional and does not limit in any way the obligations of the guarantor, the liability of the guarantor will not exceed the liability of the principal debtor. 38 Am.Jur.2d Guaranty § 74 (1968). Therefore, all guaranty contracts are conditioned upon the principal contract between the creditor and the principal debtor. 38 Am.Jur.2d Guaranty § 74 (1968); Northern Indiana Steel Supply Co. v. Chrisman, 139 Ind.App. 27, 204 N.E.2d 668 (1965).
In order to be entitled to enforce the obligation of the contract of guaranty, the creditor must show that the guaranteed debt or obligation is due, and if for any reason the debtor is not bound to make payment to the creditor, then the creditor may not hold the guarantor liable. 38 Am.Jur.2d Guaranty § 77 (1968). Like a surety, a guarantor is liable only in the event and to the extent that the principal is liable. 38 Am.Jur.2d Guaranty § 77 (1968). As noted in Brywood Ltd. Partners, L.P. v. H.T.G., Inc., 866 S.W.2d 903 (Mo.App.1993), a lessor can recover on an unconditional guaranty of a lease only by proving a claim against the lessee on the underlying lease agreement.
Cromeans relet the property after re-entering. The trial court correctly held that the reletting terminated the lease agreement. There can be no liability for rent from the date of the new leases, because the original lessee would have no right to possession of the property thereafter, even if Cromeans was not receiving rent for several months. Because there could be no liability upon the part of the original lessee for the period after Cromeans entered the new leases, it follows that there could be no liability upon the part of the guarantor for that period. Accordingly, we reverse the judgment of the Court of Civil Appeals and remand the cause for entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and ALMON, KENNEDY, and COOK, JJ., concur.
BUTTS, J., concurs in the result.
MADDOX and HOUSTON, JJ., dissent.
HOUSTON, Justice (dissenting).
I would affirm the judgment of the Court of Civil Appeals. Government Street Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68 (Ala.1989). In this case, we are dealing with a guaranty that is clear and certain. Its construction and legal effect are questions of law for the court and not questions of fact to be resolved by the trier of the facts.
MADDOX, J., concurs.