873 So.2d 1091 (2003)
BOWDOIN SQUARE, L.L.C.
v.
WINN-DIXIE MONTGOMERY, INC., and Winn-Dixie Stores, Inc.
1011661.
Supreme Court of Alabama.
June 6, 2003.
Rehearing Denied August 15, 2003.
*1093 Stewart M. Cox and F. Wendell Allen of Bradley Arant Rose & White, LLP, Birmingham; and James C. Johnston of Johnston, Druhan, LLP, Mobile, for appellant.
Norton W. Brooker, Jr., Walter M. Cook, Jr., and William E. Shreve, Jr., of Lyons, Pipes & Cook, P.C., Mobile, for appellees.
BROWN, Justice.
The plaintiff, Bowdoin Square, L.L.C., appeals the trial court's judgment entered on a jury verdict in favor of the defendants, *1094 Winn-Dixie Montgomery, Inc., and Winn-Dixie Stores, Inc. (hereinafter referred to collectively as "Winn-Dixie"). We reverse and remand.

Facts and Procedural History
This action arises from a lease dispute between the landlord, Bowdoin Square, and the tenant, Winn-Dixie, concerning a shopping center development in Saraland.[1]
In the 1980s, David H. Head developed the Saraland Square Shopping Center ("the shopping center"). A Wal-Mart discount department store, occupying approximately 90,000 square feet, and a Winn-Dixie grocery store, occupying approximately 35,000 square feet, were to be the "anchor" stores of the shopping center. In addition to the Wal-Mart store and the Winn-Dixie store, the shopping center included an area for smaller shops, plus a 6,000-square-foot retail space between the Wal-Mart and Winn-Dixie buildings.[2]
Head sold Wal-Mart that portion of the shopping center development where Wal-Mart later built its store ("the Wal-Mart tract") and retained ownership of the rest of the development, which included the space he leased to Winn-Dixie and to other tenants ("the Winn-Dixie tract").[3] As co-owners of the shopping center, Head and Wal-Mart entered into an agreement entitled "Easements with Covenants and Restrictions Affecting Land" ("the ECR"). The ECR stated that Head's and Wal-Mart's properties were "to be developed in conjunction with each other pursuant to a general plan of improvement to form a commercial shopping center." Furthermore, the ECR restricted the use of the buildings in the shopping center to "commercial purposes of the type normally found in a retail shopping center including, without limitation, financial institutions, service shops, offices, and retail stores."
In addition, Head entered into a 20-year lease with Winn-Dixie.[4] Pursuant to the lease, Winn-Dixie agreed to pay $16,041.67 per month, totaling $192,500 per annum, plus 1% of the gross sales made at the store each fiscal year. In addition, Winn-Dixie agreed to pay a pro rata share of common area maintenance ("CAM") costs accruing each year.
In 1988, Head sold his part of the shopping center development and assigned the Winn-Dixie lease to Peter Lowe, who subsequently formed Bowdoin Square, L.L.C. Bowdoin Square then acquired all rights and duties under the ECR and became subject to its covenants and restrictions.
In 1996, Wal-Mart closed its store in the shopping center. Wal-Mart's closing significantly reduced Winn-Dixie's business and contributed to Winn-Dixie's closing its store in March 1998. Still bound by the lease, Winn-Dixie continued to pay rent and listed the premises with a realtor in an effort to sublease the building.
In the fall of 1999, Wal-Mart contacted Richard Ogburn, Bowdoin Square's property manager, and notified him that Wal-Mart was considering leasing its vacant store to Hertz Corporation ("Hertz"), an automobile rental agency, to be used as a "call center," at which employees would receive telephone reservations for rental cars. In addition, Hertz had requested that Bowdoin Square lease Hertz the 6,000 square-foot area between the Wal-Mart and the Winn-Dixie buildings to be used for interviewing job applicants and as a training area for new employees.
In light of the restrictions in the ECR that the shopping center be used for "commercial purposes of the type normally found in a retail shopping center," Hertz and Wal-Mart requested that Bowdoin Square consent to amending the ECR to specifically list the Hertz call center as a permitted use and to delete the phrase *1095 that limited the uses to those "normally" found in a retail shopping center.
Bowdoin Square advised Hertz and Wal-Mart that, pursuant to Winn-Dixie's lease, Winn-Dixie's consent was necessary before the ECR could be amended.[5] Additionally, the lease between Bowdoin Square and Winn-Dixie limited the use of that part of the shopping center owned by Bowdoin Square to "retail and/or service stores"; the only exception to this restriction was that "2,800 square feet ... [of] the 11,200 square feet of local shops" located elsewhere on the shopping center property could be used as "business or professional offices";[6] thus, Bowdoin Square was also required to obtain Winn-Dixie's consent before it could lease the 6,000-square-foot space to Hertz.
In November 1999, Ogburn contacted Winn-Dixie to request its consent to the proposed amendment to the ECR and permission to lease the 6,000-square-foot space to Hertz. After determining that Hertz's proposed use of the Wal-Mart building and the 6,000-square-foot space would not be in its best interest, Winn-Dixie refused to consent to the amendment of the ECR. Winn-Dixie believed that using the property in the manner Bowdoin Square proposed would hamper its efforts to sublease its building as a retail store and that the proposed use would have a detrimental effect on parking spaces available for potential customers of a retail store. Thus, Bowdoin Square notified Wal-Mart that Wal-Mart could not amend the ECR or lease Hertz the 6,000-square-foot space.
On December 3, 1999, before Winn-Dixie had refused to consent to the amendment, Hertz contacted Ogburn and obtained keys to the 6,000-square-foot space to obtain a price quote for having carpet installed. Ogburn testified that around the first part of January 2000, he discovered that Hertz was "building out" the 6,000-square-foot area without Bowdoin Square's permission. Ogburn wrote Hertz a letter noting that Bowdoin Square's agreement to lease the space was "contingent to Bowdoin Square receiving approval from Winn-Dixie to lease this space for a non-retail use" and that Bowdoin Square, so far, had been unsuccessful in obtaining that approval. However, because Hertz had already completed so much work, Ogburn also indicated in the letter that Hertz could continue with the build-out at its own risk, but that it would have to vacate the premises if Winn-Dixie did not approve of the nonretail use of the space. Furthermore, Ogburn stated that "[Bowdoin Square could not] do anything to jeopardize its lease with Winn-Dixie." Hertz proceeded with renovating the 6,000-square-foot space and subsequently used it for a short time to interview job applicants and to train new employees. Hertz paid Bowdoin Square three months' rent for the space, which Bowdoin Square gave to its attorney with instructions that the amount be held in escrow.
On December 24, 1999, Hertz began leasing the Wal-Mart building; it opened the call center in March 2000. The call center was equipped to accommodate up to 623 agents working at a single time and was open from 6 a.m. to 2:30 a.m. The number of employees at the call center since its opening has ranged from 400 to 600 people working multiple shifts. During this time, Winn-Dixie voiced no concern about the decision by Wal-Mart to allow Hertz to open the call center.
On March 8, 2000, Winn-Dixie mailed a letter to Bowdoin Square notifying it that *1096 Winn-Dixie believed Bowdoin Square had breached the lease. The letter stated in part:
"According to our information, you have rented a portion of Saraland Square shopping center to Hertz ... and are utilizing a portion of the shopping center for training of employees to be utilized in the Hertz [call center].... This constitutes a breach of our lease....
"We believe that the easements, covenants and restrictions which are subordinate to the Winn-Dixie lease have also been modified, either formally or informally, which we maintain is an additional breach of the lease.
"... Winn-Dixie is of the opinion that the leasing of 6,000 square feet of space in the Saraland Square shopping center to Hertz is a violation of the lease agreement because the use is not of a commercial purpose of the type normally found in a retail shopping center and does not constitute a financial institution, service shop, office or retail store.
"In addition, your formal or informal modification of the ECR violates the terms thereof and also violates the terms of the Winn-Dixie lease in that, among other things, the parking area utilized by employees of the Hertz communication center will severely restrict Winn-Dixie's right (or its sub-lessee's right) to utilize such parking area. This type of activity is clearly one that was never contemplated in the original lease agreement due to the clear intent of limiting the parking lot to a use which would not constitute the parking of motor vehicles in the parking lot for extended periods of time.
"... [U]ntil such time as the common area and the rental area of the shopping center [are] utilized for [their] intended purpose, [Winn-Dixie] will not pay any rent, common maintenance, taxes, or the like with respect to the [leased] property...."
On April 18, 2000, counsel for Winn-Dixie faxed a letter to the attorney for Bowdoin Square advising the attorney that "the lease ... has terminated as a result of [Bowdoin Square's] various defaults ... as [of] 12:01 a.m. on April 14, 2000."[7] However, the letter also stated it was "not an attempt to impact either Wal-Mart or Hertz."
Thereafter, on April 21, 2000, in response to Winn-Dixie's purported termination of the lease and its abandonment of the premises, Bowdoin Square sued Winn-Dixie seeking to recover the amounts due under the remainder of the term of the lease, including all remaining rent, CAM costs, and all other sums due to be paid under the lease. In response, Winn-Dixie filed a counterclaim alleging that Bowdoin Square had materially breached the terms of the lease agreement and that, therefore, Winn-Dixie had the right to terminate the lease.
The case was tried before a jury. At the close of evidence, Bowdoin Square moved for a judgment as a matter of law ("JML"), claiming that it had demonstrated that Winn-Dixie had wrongfully terminated the lease and had abandoned the premises. The trial court denied this motion. However, the trial court did grant in part a motion for a JML filed by Winn-Dixie, holding that the Hertz call center was a violation of the ECR "use agreement" between Bowdoin Square and Wal-Mart. Furthermore, the trial court held that, although the call center was not a breach of the lease between Winn-Dixie *1097 and Bowdoin Square, Bowdoin Square had a duty to challenge, on behalf of Winn Dixie, Wal-Mart's decision to lease the building to Hertz. Finally, the trial court held that Bowdoin Square's right to relief for Winn-Dixie's alleged breach of the lease was limited under paragraph 21 of the lease, the "tenant default provision."
The trial court then charged the jury that it should decide the following factual issues: (1) whether Bowdoin Square's failure to challenge Wal-Mart's lease of its property for the Hertz call center amounted to a material breach of Bowdoin Square's lease with Winn-Dixie; (2) whether Bowdoin Square's failure to prevent the use of the 6,000-square-foot space as part of the Hertz call center was a breach of Winn-Dixie's right to the quiet enjoyment of the leased property, and, if so, whether it amounted to a material breach of the lease agreement; (3) whether Bowdoin Square's failure to protect the parking spaces Winn-Dixie was entitled to under the lease agreement amounted to a material breach of that agreement; and (4) whether Bowdoin Square had complied with paragraph 21 of the lease agreement in attempting to collect from Winn-Dixie missed rent payments.[8] The jury returned a general verdict in favor of the defendant, Winn-Dixie. Bowdoin Square appeals.

Standard of Review
When reviewing a trial court's ruling on a motion for a JML, we have stated:
"`[T]his Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present "substantial evidence" in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).'"
I.C.U. Investigations, Inc. v. Jones, 780 So.2d 685, 688 (Ala.2000).

Analysis
Bowdoin Square raises a number of issues on appeal. First, Bowdoin Square maintains that the trial court erred in holding that any relief Bowdoin Square might seek against Winn-Dixie was limited by paragraph 21 of the lease agreement. Bowdoin Square further argues that this erroneous holding precluded it from proceeding on its claim that Winn-Dixie had abandoned the premises. Second, Bowdoin *1098 Square asserts that the trial court erred in ruling as a matter of law that Hertz's use of the Wal-Mart tract violated the ECR. Third, Bowdoin Square argues that the trial court erred in denying its motion for a JML based on Winn-Dixie's failure to present any evidence justifying its terminating the lease. Finally, Bowdoin Square maintains that the trial court erred by denying it the opportunity to pursue future lease payments from Winn-Dixie.

I. Paragraph 21

Bowdoin Square alleges that the trial court erred in limiting Bowdoin Square's options for relief against Winn-Dixie to only those specified in paragraph 21 of the lease agreement.
Paragraph 21 states as follows:
"DEFAULT 21. In the event the Tenant should fail to pay any of the monthly installments of rent reserved herein for a period of more than ten (10) days after the same shall become due and payable, or if the Tenant shall fail to keep or shall violate any other condition, stipulation or agreement herein contained, on the part of the Tenant to be kept and performed, and if either such failure or violation shall have continued for a period of thirty (30) days after the Tenant shall have received written notice by certified or registered mail at its office... from the Landlord to pay such rent or to cure such violation or failure, then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises by summary proceedings or otherwise expel Tenant and remove all property therefrom and relet the premises at the best possible rent obtainable, making reasonable efforts therefor and receive the rent therefrom, but Tenant shall remain liable for the deficiency, if any, between Tenant's rent hereunder and the price obtained by Landlord on reletting...."
(Emphasis added.)
A. Whether paragraph 21 limits Bowdoin Square's relief
Bowdoin Square maintains that paragraph 21 of the lease agreement does not limit its options in seeking relief for Winn-Dixie's alleged breach. It is well settled that lease agreements are contracts and that the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement. 49 Am.Jur.2d Landlord & Tenant § 43 (1995). In deciding the rights of the parties under a lease, courts are required to give effect to the unambiguously expressed intent of the parties. Darling Shop of Birmingham v. Nelson Realty Co., 255 Ala. 586, 591, 52 So.2d 211, 215 (1951); see also 49 Am.Jur.2d Landlord & Tenant § 43. Where language used in a lease is plain and unambiguous, there is no room for construction of the contract. Babcock v. Smith, 285 Ala. 557, 562, 234 So.2d 573, 577-78 (1970). Therefore, if a lease is reduced to writing, the court must ascertain from the writing the intention of the parties, and the provisions of the writing are conclusive and govern the rights of the parties. 49 Am.Jur.2d Landlord & Tenant § 53 (1995). Furthermore, the court is required to give the words in the lease their ordinary meaning. Hill v. Talladega College, 502 So.2d 735, 737 (Ala.1987); BoWing Office Sys., Inc. v. Johnson, 744 So.2d 915, 918 (Ala.Civ.App.1999); see also, 49 Am.Jur.2d Landlord & Tenant § 54 (1995).
The pertinent phrase at issue in paragraph 21 provides that upon the tenant's default, "the Landlord, at its option, may" either terminate the lease or mitigate and seek damages. As Bowdoin Square correctly argues, this Court has long recognized *1099 that words such as "may" and "at its option" denote permissive alternatives, not mandatory restrictions. See Rudisill Soil Pipe Co. v. Eastham Soil Pipe & Foundry Co., 210 Ala. 145, 97 So. 219, 221-22 (1923) (lease stipulation that lessee "may, at its option, elect" was not mandatory but permissive stipulation); see also Mobile Eye Ctr., P.C. v. Van Buren P'ship, 826 So.2d 135, 138 (Ala.2002) (renewal provision that stated that the lease "may" be renewed did not operate automatically to renew lease); ANCO TV Cable Co. v. Vista Comm. Ltd. P'ship I, 631 So.2d 860, 863 (Ala.1993) (holding that "may" signified discretion). Therefore, applying the ordinary meaning of the language contained in paragraph 21, we conclude that the lease does not foreclose common-law remedies for Winn-Dixie's default.
Winn-Dixie raises a number of arguments in support of the trial court's finding that paragraph 21 provided Bowdoin Square the exclusive remedies for Winn-Dixie's alleged breach. However, we need address only two of Winn-Dixie's arguments. First, Winn-Dixie claims that the trial court's reading of the lease is consistent with that of other courts considering similar provisions. Specifically, Winn-Dixie relies on two cases from foreign jurisdictionsLinens of Paris, Inc. v. Cymet, 510 So.2d 1021 (Fla.Dist.Ct.App.1987), and Wilson v. Pate, 17 Ariz.App. 461, 498 P.2d 535 (1972). In Linens of Paris, the lease provided that upon the tenant's breach the landlord could either cancel the lease or attempt to re-let the premises as the tenant's agent. In Wilson, the lease provided that, upon the tenant's failure to pay the rent, the "lessor may, at his election, either distrain for said rent due or declare this lease at an end, and recover possession...." In both cases, the courts determined that by executing the leases the parties had modified their common-law rights and set out their remedies specifically under the lease. Therefore, the landlords were limited to only those options specified in the leases.
As discussed above, this Court has long recognized that words such as "may" and "at its option" denote permissive alternatives. Moreover, Linens of Paris and Wilson give virtually no analysis of the meaning of these terms.[9] Therefore, we find that those cases are distinguishable.
Next, Winn-Dixie argues that in giving paragraph 21 its ordinary meaning, the focus should be on the words "either ... or" rather than on the words "may" or "at its option." Winn-Dixie contends that with the inclusion of "either ... or" the provision connotes a choice between two alternatives and, giving the provision its ordinary meaning, Bowdoin Square is limited to only those alternatives. We disagree. Because the clause "the Landlord, at its option, may" appears before the specification of the two remedies, we find that the better reading is that the provision simply sets forth the elective rights of Bowdoin Square. See 17A Am.Jur.2d Contracts § 748 (1991) ("Where, however, there is no express or implied limitation in the contract making the stated remedy exclusive, the prevailing view seems to be that a party may at his election pursue either the prescribed remedy or any other remedy the law gives...."). Accordingly, we hold that, as a matter of law, paragraph 21 is permissive in nature and allows Bowdoin Square to seek redress outside of the alternative remedies discussed in paragraph *1100 21. Therefore, the trial court erred in holding that paragraph 21 limited Bowdoin Square's relief for Winn-Dixie's alleged breach of the lease agreement.
B. Should the issue whether Winn-Dixie had abandoned the premises have been submitted to the jury
Bowdoin Square next argues that, because paragraph 21 does not foreclose its common-law remedies, it has the right to submit to the jury the issue whether Winn-Dixie abandoned the premises. We agree.
The distinction between default and abandonment has previously been recognized in Alabama law. See International Tool & Eng'g Co. v. Sullivan, 389 So.2d 138, 140 (Ala.Civ.App.1980); Locascio v. Barber, 17 Ala.App. 595, 87 So. 703, 704 (1920). The issue whether the lease was terminated by abandonment of the premises is a question of fact. See Ex parte Kaschak, 681 So.2d 197, 200 (Ala.1996). As a general rule, abandonment occurs when the lessee leaves the premises vacant with the avowed intention not to pay rent. tenBraak v. Waffle Shops, Inc., 542 F.2d 919, 924 n. 5 (4th Cir.1976); see also 49 Am.Jur.2d, Landlord & Tenant § 250 (1995). For a lessee's actions to amount to an abandonment, two elements must be proven: (1) that the lessee vacated the premises and (2) that the lessee had a clear intent not to be bound by the lease. tenBraak, 542 F.2d at 924 n. 5; see also 49 Am.Jur.2d, Landlord & Tenant § 250; Gavin L. Phillips, Annotation, What Constitutes Abandonment of Residential or Commercial LeaseModern Cases, 84 A.L.R.4th 183, § 2[a] (1991); 51C C.J.S. Landlord & Tenant § 125(2) (1968).
Under Alabama common law, once a lessee abandons a leasehold, the landlord has two remedies. Kaschak, 681 So.2d at 200. The landlord may allow the premises to remain vacant and recover rent for the whole term of the lease, or the landlord may end the lease by accepting the abandoned property and reentering the premises. Kaschak, 681 So.2d at 200; Crestline Ctr. v. Hinton, 567 So.2d 393, 396 (Ala.Civ.App.1990); International Tool, 389 So.2d at 139. Furthermore, the landlord is under no affirmative duty to mitigate any damages arising under a default on a lease agreement by a tenant. Kaschak, 681 So.2d at 200.
In tenBraak v. Waffle Shops, Inc., supra, the lessor, tenBraak, and the lessee, Waffle Shops, Inc., had entered into a 20-year term lease. The lease contained a "tenant default" provision that stated that in the event the lessee failed to pay rent or breached any affirmative covenant in the lease, tenBraak "may" terminate the lease or mitigate and sue the lessee for damages. Waffle Shops subsequently abandoned the premises and tenBraak sued, seeking damages for Waffle Shops' breach of the lease. At trial, Waffle Shops argued that tenBraak was bound by the tenant-default provision in the lease and could recover damages only as set out under that provision.
In calculating tenBraak's damages, the court found that the lease contained no provisions specifically addressing the lessor's recovery upon abandonment of the premises by the lessee. However, the lease did contain a reentry provision, which stated that in the event of default by the tenant in the payment of the rent or upon breach of any affirmative covenant in the lease the lessor, upon meeting certain notice requirements, "may" reenter. Strictly construing the provision, the court found that the provision, by stating that the lessor "may" reenter upon a tenant's breach, merely created a right of reentry but did not impose a duty upon the lessor to reenter. Therefore, the court held, *1101 tenBraak could pursue common-law remedies available to it for a tenant's abandonment of the leasehold.
We believe that the rationale of tenBraak is instructive in this case. As was the case in tenBraak, paragraph 21 of the lease agreement between Bowdoin Square and Winn-Dixie speaks only of Winn-Dixie's failing to pay rent or failing to keep or violating any other condition, stipulation, or agreement contained in the lease. It does not specifically address the procedure to be instituted should Winn-Dixie abandon the premises. As a result, Bowdoin Square "may," if it so chooses, look to common-law remedies, such as the ones provided in the event of abandonment, for Winn-Dixie's breach of the lease. Therefore, the trial court erred in not allowing Bowdoin Square to submit the issue of Winn-Dixie's abandonment of the premises to the jury.

II. Whether Hertz's "call center" violated the ECR

Bowdoin Square maintains that the trial court erred in finding as a matter of law that, because a call center was not a normal use of the premises at the time the parties entered into the ECR, Hertz's use of the Wal-Mart building as a call center violated the ECR's "use" provision.[10] Specifically, Bowdoin Square argues that the "use" provision in the ECR should be construed in a manner that does not unduly bind the parties to an inflexible arrangement. Furthermore, Bowdoin Square asserts that when general terms are used to describe acceptable uses under a lease covenant where more than one construction is possible, the proper construction would be the construction that does not limit the property's uses.
The ECR "use" provision states:
"2. Use. Buildings in the shopping center shall be used for commercial purposes of the type normally found in a retail shopping center, including, without limitation, financial institutions, service shops, offices, and retail stores...."
Bowdoin Square contends that this provision contains no language limiting when the determination of what uses are "normally found in shopping centers" is to be made. Thus, Bowdoin Square maintains, the provision should be read to facilitate uses likely to evolve in the commercial retail market over the term of the ECR. We disagree.
A plain reading of the provision reveals no language limiting the phrase "normally found in a shopping centers" to a certain time period, whether it be 1987, when the lease was entered, or in 2000, when this dispute arose. However, it is well settled that a contract must be construed as of the date on which it was made. Maxwell Planting Co. v. A.P. Loveman & Co., 212 Ala. 228, 232, 102 So. 45, 48 (1924); see also 17A C.J.S. Contracts § 302, at 312 (1999). Furthermore, contracts are to be construed according to the intentions of the parties and in light of the circumstances at the time they were made. Russell v. Garrett, 208 Ala. 92, 95, 93 So. 711, 713 (1922). Contracts "cannot be based upon events occurring subsequent to their execution." Allright Auto Parks, Inc. v. Berry, 219 Tenn. 280, 288-89, 409 S.W.2d 361, 364 (1966); see also Howell v. Landry, 96 N.C.App. 516, 386 S.E.2d 610, 619 (1989); Piano v. Gulf *1102 Coast Inv. Corp., 429 S.W.2d 554, 556 (Tex. Civ.App.1968).
Both parties offered conflicting expert testimony as to whether call centers like the one operated at Saraland Square by Hertz were commonly found in commercial shopping centers at the time this action was instituted. However, the expert witnesses called by both parties testified that in 1987, when the ECR was entered into, call centers, or other comparable facilities, did not exist. Therefore, it is undisputed that at the time Bowdoin Square and Wal-Mart executed the ECR call centers were not a use "normally found in retail shopping centers." Accordingly, because the ECR must be construed as of the date on which it was made and cannot be based upon actions that occurred subsequent to its execution, the trial court did not err in holding that the Hertz call center was not a contemplated use as described in the ECR.

III. Bowdoin Square's Motion for a JML

Bowdoin Square argues that the trial court erred in denying its motion for a JML. Specifically, Bowdoin Square contends that, except as provided in the lease agreement itself, Winn-Dixie had no independent right to terminate the lease. Alternatively, Bowdoin Square maintains that, even if Winn-Dixie did have the right to terminate the lease, that termination was not justified by any breach by Bowdoin Square of the covenant of quiet enjoyment or under the doctrine of constructive eviction.

A. Winn-Dixie's right to terminate the lease

Bowdoin Square argues that termination of a long-term commercial lease is an extraordinary event; thus, termination should be allowed only in extreme circumstances. Moreover, Bowdoin Square contends that under Alabama law, a tenant is allowed to terminate its lease only under those circumstances set out in the lease. According to Bowdoin Square, the lease agreement in this case allowed termination by Winn-Dixie only under four circumstances.[11] Bowdoin Square argues that Winn-Dixie never attempted to prove that any of those circumstances existed when it purported to terminate the lease; thus, Bowdoin Square asserts, the trial court should have granted its motion for a JML. We disagree.
As a general rule, except to the extent the parties to a lease agree otherwise, if a landlord fails to perform a valid promise contained in the lease, thus depriving the tenant of a significant inducement to the making of the lease, the tenant may attempt to terminate the lease. 49 Am. Jur.2d Landlord & Tenant § 83 (1995); 51C C.J.S. Landlord & Tenant § 113 (2002) (lessor's breach of an essential covenant entitles the lessee to terminate the lease); see also Health Care Mgmt. Corp. v. Rubenstein, 540 So.2d 77, 78 (Ala.Civ. App.1989) (one party's material breach excuses the other party from performance); O'Byrne v. Henley, 161 Ala. 620, 50 So. 83 (1909) (a breach of the implied covenant of quiet enjoyment by the lessor authorizes the tenant to terminate the lease and abandon premises). Thus, Winn-Dixie has the right to terminate the lease and vacate *1103 the premises, if Bowdoin Square failed to perform an essential covenant.[12]

B. Bowdoin Square's alleged breaches of the lease agreement

At trial, Winn-Dixie claimed that Bowdoin Square breached the covenant of quiet enjoyment, that it constructively evicted Winn-Dixie from the premises, and that it materially breached the lease agreement.[13] Therefore, Winn-Dixie argues, the trial court correctly denied Bowdoin Square's motion for a JML. On appeal, Bowdoin Square argues that, even if Winn-Dixie's allegations were true, termination of a lease cannot be justified by a breach of a covenant of quiet enjoyment or under the doctrine of constructive eviction. We disagree. However, in disagreeing, we hold only that Winn-Dixie may raise these defenses; whether Bowdoin Square's actions amounted to a breach of Winn-Dixie's quiet enjoyment or a constructive eviction is a jury question to be answered on remand.
First, Bowdoin Square contends that the lease agreement contains an express covenant of quiet enjoyment that does not allow Winn-Dixie to terminate the lease except where new zoning restrictions interfere with its business. We find this argument to be without merit.
The express covenant of quiet enjoyment in the lease states:
"QUIET ENJOYMENT 18. The landlord covenants, warrants and represents that upon commencement of the lease term ... the Tenant on paying the rent herein reserved and performing the covenants and agreements hereof shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges belonging or in anywise appertaining thereto, during the full term of this lease....
"The Landlord warrants the non-existence of any zoning or other restriction preventing or restricting use of the demised premises for the conduct of a general mercantile business or use of common areas for parking purposes, and that should such zoning or other restriction be in affect [sic] or adopted at any time during the term of this lease, preventing or restricting Tenant from conducting a general mercantile business or using the common areas ... the Tenant at its option may terminate this lease and shall stand released of and from further liability hereunder."
(Emphasis added.) Clearly, Winn-Dixie's right to terminate the lease based on a breach of the covenant of quiet enjoyment is not limited only to the imposition of new zoning restrictions, but also to any restriction that hinders it from "conducting a general mercantile business or using the common areas." Moreover, the trial court charged the jury that under this express covenant Winn-Dixie had the right to terminate the lease if the jury found that Bowdoin Square failed to uphold its covenant to ensure "that [Winn-Dixie] ... shall peaceably and quietly have, hold and enjoy the demised premises and all rights, easements, appurtenances and privileges *1104 belonging ... thereto, during the full term of the lease...." Because Bowdoin Square offers no explanation as to how the trial court erred in giving this charge, we find no error as to this issue.
Bowdoin Square also alleges that Winn-Dixie waived the affirmative defense of constructive eviction. However, from our review of the record and the trial transcript, it is apparent that the parties have misconstrued the doctrine of constructive eviction as it exists in Alabama. Specifically, Alabama does not recognize constructive eviction and breach of quiet enjoyment as separate claims. Oliver v. Bush, 125 Ala. 534, 27 So. 923, 924 (1900) (an action for constructive eviction is, in substance and effect, the same as one for a breach of the covenant of quiet enjoyment); see also David C. Skinner, Alabama Residential, Commercial & Mineral Lease Law § 7-7(h) (cum.supp.1999). Rather, Alabama follows the common-law concept that a tenant has a covenant to quiet enjoyment of the premises. Id. Therefore, in Alabama, an action for constructive eviction must be framed as a violation of the covenant of quiet enjoyment. Steele v. McRaney, 855 So.2d 1114, 1121 (Ala.Civ.App.2003) (stating that a party may be responsible for a breach of the covenant of quiet enjoyment by constructively evicting the plaintiff); see also Southern Sec. Servs., Inc. v. Esneault, 435 So.2d 1309, 1312 (Ala.Civ.App.1983) (landlord's interference with the tenant's right to quiet enjoyment may constitute a constructive eviction); Skinner, § 7-7(h). As a result, Winn-Dixie's claim of constructive eviction is, in effect, part of its claim of the breach of the covenant of quiet enjoyment. Therefore, Winn-Dixie did not waive this issue.

IV. Bowdoin Square's Right to Pursue Future Lease Payments

Finally, Bowdoin Square maintains that the trial court erred in dismissing its claim for future rent. Specifically, Bowdoin Square contends that it is entitled to the total amount of lease payments due under the 20-year lease, regardless of whether the payments had accrued before Winn-Dixie terminated the lease. We disagree.
As Winn-Dixie correctly asserts, Ala.Code 1975, § 6-5-280, provides that if a contract is severable or if the breaches occur at successive periods during the existence of the contract, such as where money is to be paid in installments, an action will lie for each breach. Leases for periodic rent fall within this category. See Nicrosi v. Roswald, 113 Ala. 592, 21 So. 338, 339 (1897); Dawson v. Haygood, 235 Ala. 648, 180 So. 705, 707 (1938). Each failure to pay an installment when due creates a separate cause of action. Old Southern Life Ins. Co. v. Free, 46 Ala.App. 622, 247 So.2d 379, 382 (1971). Because an action may not be maintained before a cause of action has accrued, Freider v. Leinkauff, 92 Ala. 469, 8 So. 758, 759 (1891), a landlord suing for breach of a lease can recover only rent that has accrued and that remains unpaid. Nicrosi, 113 Ala. at 595, 21 So. at 339.
Bowdoin Square cites cases for the proposition that under Alabama law when a tenant abandons its leasehold the landlord may allow the premises to remain vacant and recover rent for the whole term of the lease. McClure v. Daniel, 45 Ala. App. 558, 561-62, 233 So.2d 500, 502 (1970); Locascio v. Barber, 17 Ala.App. 595, 87 So. 703 (1920). These cases are consistent with the above principles. Upon a showing of abandonment of the premises by the tenant, the landlord may recover the whole lease payment, either by suing at the end of the lease term when all *1105 of the lease payments have accrued, or it may bring a separate action for each missed payment as it accrues. See Ryals v. Laney, 338 So.2d 413, 415-16 (Ala.Civ. App.1976) (holding that upon abandonment by lessee, landlord was entitled to all accrued rental payments). Furthermore, the lease at issue does not contain an acceleration clause. As a result, we hold that the trial court was correct in not allowing Bowdoin Square's claim for future rent.

Conclusion
Because we hold that the trial court erred in determining that paragraph 21 of the lease provided Bowdoin Square's sole remedy against Winn-Dixie, we reverse its judgment and remand the case for a new trial. See Jim Walter Homes, Inc. v. Kendrick, 810 So.2d 645, 651 (Ala.2001) (holding that where one claim is improperly submitted to the jury and the jury returns a general verdict, the judgment entered on that verdict must be reversed and the cause remanded for a new trial even if other claims were properly submitted); see also Larrimore v. DuBose, 827 So.2d 60, 63 (Ala.2001).
REVERSED AND REMANDED.
SEE and STUART, JJ., concur.
MOORE, C.J., concurs in the result.
HARWOOD, J., concurs in part and dissents in part as to the rationale and concurs in the result.
HARWOOD, Justice (concurring in part and dissenting in part as to the rationale and concurring in the result).
I concur with all aspects of the main opinion except the rationale and holding expressed in the section identified as "I. Paragraph 21 ... A. Whether paragraph 21 limits Bowdoin Square's relief." I do not find the operative language in paragraph 21 of the lease, which reads, "In the event the Tenant [should default in certain respects], then, in any such event, the Landlord, at its option, may either (a) terminate this lease or (b) re-enter the demised premises ...," to be unambiguous. "An `instrument is unambiguous if only one reasonable meaning clearly emerges.' " Reeves Cedarhurst Dev. Corp. v. First Amfed Corp., 607 So.2d 184, 186 (Ala.1992) (quoting Vainrib v. Downey, 565 So.2d 647, 648 (Ala.Civ.App.1990)). The particular syntax of the clause in question leaves room for more than one reasonable interpretation.
On the one hand, the parties may have intended to convey the meaning that, in the event of a default by the tenant, the landlord could, at its option, exercise the recourses stated as "(a)" and "(b)," or, as a further option, pursue any alternative remedy otherwise available under Alabama law. On the other hand, the parties may have intended by the phrasing to signify that the landlord's options were limited to the two options expressly stated. The order of the words in question permits the interpretation that the option accorded the landlord was not to choose from among the whole universe of remedies, both specified and nonspecified, but rather to choose either remedy (a) or remedy (b). In that regard, the scope of the option is explained, and limited, by the specification of only two choices, stated in the alternative, of either (a) or (b).
The three prior decisions of this Court relied on by the main opinion do not provide conclusive guidance for our construction of the particular clause at issue. In Rudisill Soil Pipe Co. v. Eastham Soil Pipe & Foundry Co., 210 Ala. 145, 97 So. 219 (1923), the language at issue in the lease contract stated: "As often as profits shall accrue in such amount that, in the *1106 judgment of the lessee, the said lessee can spare such funds from its operating capital, the lessee may, at its option, elect that said sums [shall be put to a particular use]," with all such profits "which shall not have been applied [to that use] ... retained...." 210 Ala. at 149, 97 So. at 221. This Court simply held that such a combination of permissive language was "not the equivalent of the stipulation that such party must pay." 210 Ala. at 149, 97 So. at 222. In Mobile Eye Center, P.C. v. Van Buren Partnership, 826 So.2d 135 (Ala. 2002), the renewal clause in the lease stated that "[w]ith the mutual consent of the parties this lease may be renewed...." 826 So.2d at 136. We construed that phrasing as representing "merely an agreement to agree to a renewal of the lease, which is not enforced in Alabama." 826 So.2d at 138. Finally, in ANCO TV Cable Co. v. Vista Communications Ltd. Partnership I, 631 So.2d 860 (Ala.1993), the subordinated promissory notes involved specified that under certain delineated scenarios involving any "Senior Indebtedness," the registered holders of the subordinated notes "may from time to time receive payments" of principal and interest. 631 So.2d at 862. Recognizing that "the term `may' denotes to be able," the Court concluded that the clause gave the obligor of the notes the right, but not the mandatory duty, to make payments. If the latter situation had been intended, "then we would reasonably expect language that vested in the holders of the notes a right to require payment." 631 So.2d at 863.
Given the more clearly permissive language of the clauses involved in those three cases, readily distinguishable from that used in the language before us outlining the options on the lessee's default, I do not derive much transferable guidance from those fact-specific holdings.
I agree with the main opinion that the two cases relied on by Winn-Dixie, Linens of Paris, Inc. v. Cymet, 510 So.2d 1021 (Fla.Dist.Ct.App.1987), and Wilson v. Pate, 17 Ariz.App. 461, 498 P.2d 535 (1972), give virtually no analysis for their respective conclusions that the default-options clauses in question specified the exclusive remedies available to the lessor. Nonetheless, they involved clauses more nearly comparable to the one at hand than did Rudisill, Mobile Eye Center, or ANCO TV. No verbatim recital of the clause was provided in Linens of Paris; however, the Florida District Court of Appeal paraphrased the clause as stating that once the tenant breached the lease, the landlord "could either cancel the lease or attempt to re-let the premises as [the tenant's] agent." 510 So.2d at 1021. In Wilson, the lease clause provided that upon nonpayment of rent, "`the said lessor may, at his election, either distrain for said rent due, or declare this lease at an end and recover possession as if the same was held by forcible detainer....'" 498 P.2d at 535.
At the least, those two foreign decisions reflect how a clause stipulating that a landlord, following default, "may, at his election [or, as in the present case, `at its option'] either [pursue one course of action] or [pursue an alternative course of action]," can be interpreted differently than the main opinion interprets the clause in this case.
I agree with the main opinion that the trial court erred in holding, as a matter of law, that Bowdoin Square's right to relief for Winn-Dixie's alleged default was limited under paragraph 21 of the lease to either the recourse available under clause (a) or the recourse available under clause (b). I respectfully disagree equally, however, with the holding in the main opinion that "as a matter of law, paragraph 21 is permissive in nature and allows Bowdoin *1107 Square to seek redress outside of the alternative remedies discussed in paragraph 21." 873 So.2d at 1099-1100. Rather, because I find that paragraph 21 is ambiguous concerning the permissive versus restrictive nature of the two remedy options specified, I would reverse the judgment and remand the case for a new trial as does the main opinion, but in the new trial I would refer the resolution of the ambiguity to the jury. In that regard, it might be proper for the trial judge to instruct the jury concerning the construction of an ambiguous provision pursuant to the rule of contra proferentem stated in note 9 of the main opinion,[14] but I do not consider that to be a rule we should use in determining, as is our role in a de novo review, the question of law of whether there is in fact an ambiguity. Rather, that principle would come into play only in the hands of the fact-finder assigned the task of resolving an ambiguity so found.
*1108 
NOTES
[1] The differing parcels and disputed areas are depicted in the appendix to this opinion, which consists of a schematic of the shopping center development delineating the ownership of the different areas of the development.
[2] See the appendix to this opinion.
[3] See the appendix to this opinion.
[4] This lease agreement was drafted by Winn-Dixie.
[5] The lease between Bowdoin Square and Winn-Dixie stated: "[Bowdoin Square] agrees not to consent to or join in cancellation or amendment of the ECR ... without [Winn-Dixie's] written consent."
[6] See the appendix to this opinion.
[7] Winn-Dixie chose April 14, 2000, as the termination date because it contends that that date was 30 days after Bowdoin Square received Winn-Dixie's March 8 letter.
[8] Because the trial court had already determined that Bowdoin Square's relief was limited under paragraph 21, if the jury found that Bowdoin Square had not complied with that paragraph, Bowdoin Square would have no right to any rental payments from Winn-Dixie.
[9] The language in paragraph 21 of the lease agreement is unambiguous. See Brewbaker Motors, Inc. v. Belser, 776 So.2d 110, 112 (Ala.2000). However, if the provision were ambiguous, we note that it would be construed most strongly against Winn-Dixie, as the drafter of the lease. See Brewbaker Motors, Inc., 776 So.2d at 112.
[10] As noted earlier, the trial court did not hold that the violation of the ECR constituted a breach by Bowdoin Square of Winn-Dixie's lease agreement. Instead, the trial court submitted to the jury the issue whether Bowdoin Square's failure to challenge Hertz's use constituted a material breach of its duties under the lease agreement with Winn-Dixie.
[11] The lease allowed Winn-Dixie to terminate the lease if (1) the number of parking spaces in the shopping center fell below a total of 350 spaces or below a ratio of 6.5 spaces per 1,000 square feet of building area; (2) Bowdoin Square failed to repair within a specific period premises damaged by fire or other casualty; (3) zoning or other restrictions inhibited Winn-Dixie's business; or (4) a condemnation action by the government rendered the premises useless to Winn-Dixie.
[12] The cases cited by Bowdoin Square lend no support to its argument. Those cases Kennamer Shopping Center, Inc. v. Bi-Low Foods, Inc., 571 So.2d 299 (Ala.1990) (an unlawful-detainer action); Bazzel v. Pine Plaza Joint Venture, 491 So.2d 910 (Ala.1986) (partial physical destruction of premises); and Joiner v. Brightwell, 252 Ala. 112, 39 So.2d 414 (1949) (accidental physical destruction of premises)do not address an alleged material breach by the landlord; they are therefore distinguishable.
[13] These allegations were raised first as counterclaims; however, the trial court subsequently converted the counterclaims to affirmative defenses.
[14] The general rule of contra proferentem is to be employed only as a rule of last resort, after other rules of construction have been exhausted. Lackey v. Central Bank of the South, 710 So.2d 419, 422 (Ala.1998). However, specific to ambiguities in lease contracts, this Court has stated: "A lease must be construed most strongly against the lessor and liberally in favor of the lessee." Greenwood v. Bennett, 208 Ala. 680, 684, 95 So. 159, 163 (1923). See also People's Bank & Trust Co. v. Tissier Hardware Co., 154 Ala. 103, 45 So. 624 (1907); Marcrum v. Embry, 291 Ala. 400, 282 So.2d 49 (1973); and Gulf Fishing & Boating Club, Inc. v. Bender, 370 So.2d 1026 (Ala.Civ. App.1979).